800 F.2d 568
 55 USLW 2165, 1986-2 Trade Cases 67,260
 POTTERS MEDICAL CENTER, a corporation; the Neurosurgical
Clinic and Allied Health Specialties, Inc., a professional
corporation; Beaver Creek Bio- Medical, Inc., a
corporation, Plaintiffs-Appellants,
v.
The CITY HOSPITAL ASSOCIATION d/b/a East Liverpool City
Hospital, a corporation; Jackman S. Vodrey; J.W.
Schoolnic, M.D., Defendants-Appellees.
 No. 85-3182.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 31, 1986.
Decided Sept. 4, 1986.
 
 Douglas J. Colton (argued), Albert J. Angel, Wood, Lucksinger & Epstein, Washington, D.C., for plaintiffs-appellants.
 Jackman S. Vodrey, East Liverpool, Ohio, David J. Young, Murphey, Young & Smith, Columbus, Ohio, Steven Tigges (argued), Steven E. Sigalow, Akron, Ohio, for defendants-appellees.
 Before CONTIE, Circuit Judge, PECK, Senior Circuit Judge, and GIBSON*, District Judge.
 JOHN W. PECK, Senior Circuit Judge.
 
 
 1
 Plaintiffs Potters Medical Center ("Potters"), Neurosurgical Clinic and Allied Health Specialties, Inc. ("NCA"), and Beaver Creek Bio-Medical, Inc. ("BCB") appeal the summary judgment entered in this antitrust action by the district court in favor of defendants East Liverpool City Hospital ("City Hospital"), Jackman Vodrey, and J.W. Schoolnic, M.D.[1] Plaintiffs' complaint alleged that defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2, and sought injunctive relief as well as treble damages under Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15. The complaint also alleged a pendent state claim for violation of Ohio's antitrust law, the Valentine Act, Ohio Rev.Code Sec. 1331.01 et seq. For the reasons stated below, we affirm the judgment of the district court in part, reverse in part, and remand this case for further proceedings consistent with this opinion.
 
 I.
 
 2
 Potters is a 39-bed general acute care hospital in operation since 1977 in East Liverpool, Ohio. Potters also provides pathology services. NCA is a professional corporation which owns and operates a nearby diagnostic imaging facility. BCB is a corporation formed in connection with the construction of a physician office building and minor emergency clinic adjacent to Potters. Although NCA and BCB are separately incorporated, there are indications in the record that they are affiliated with Potters.
 
 
 3
 City Hospital, a 275-bed general acute care hospital, is the only other hospital in East Liverpool, Ohio, and is located one block away from Potters. City Hospital also provides pathology services and minor emergency care. Vodrey is an attorney for City Hospital and a member of its Board of Trustees. Schoolnic is a senior member of City Hospital's medical staff and serves as the chairman of City Hospital's Department of Internal Medicine.
 
 
 4
 In their complaint filed October 17, 1983, Potters, NCA, and BCB alleged Sherman Act violations with respect to four relevant markets. In Count One, they alleged that City Hospital had a monopoly in the provision of hospital inpatient services and violated Secs. 1 and 2 of the Sherman Act with respect to that market by: (1) refusing to grant staff privileges to doctors with Potters' privileges, thereby depriving Potters of admissions and referrals; (2) pressuring doctors with City Hospital staff privileges not to seek staff privileges at Potters, thus depriving Potters of admissions and referrals; (3) opposing Potters' efforts to obtain the certification under Sec. 1122 of the Social Security Act, 42 U.S.C. Sec. 1320a-1, necessary for reimbursement of certain capital expenditures; (4) conspiring with the Hospital Care Corporation to prevent Potters from obtaining a Blue Cross participating hospital contract, thereby depriving Potters of admissions and reimbursements; (5) engaging in sham proceedings against Potters regarding BCB's alleged lack of compliance with "certificate of need" laws prior to building an emergency care clinic; and (6) entering restrictive contracts with City Hospital staff physicians which prohibit their dealings with Potters. They further alleged that Vodrey and Schoolnic conspired with City Hospital with respect to these acts.
 
 
 5
 Count Two alleged that City Hospital had a monopoly over the provision of minor emergency services and sought illegally to maintain its monopoly and suppress competition in this market through: (1) intimidation and coercion of a City Hospital staff physician who voiced an intent to operate a competing minor emergency services facility, and (2) instigation of and participation in sham proceedings against Potters to suppress BCB's competition. Count Two also alleged that defendants conspired to monopolize and to restrain trade in this market.
 
 
 6
 Count Three alleged that defendants illegally conspired and sought to maintain City Hospital's monopoly over outpatient pathology services by (1) coercing physicians not to direct patients to Potters' outpatient pathology services, and (2) by offering improper incentives to doctors to refer such business to City Hospital.
 
 
 7
 Count Four alleged that City Hospital sought to destroy NCA's diagnostic imaging services, monopolized radiology services in this market, and attempted to monopolize CT-scanning services by: (1) refusing doctors employed by NCA access to staff privileges at City Hospital, thereby depriving NCA and Potters of patient referrals and revenues; (2) harassing physicians to prevent them from referring patients to NCA and Potters, and coercing them to refer CT-scan patients to providers other than NCA; (3) restricting the ability of NCA doctors to consult or provide services to patients admitted to City Hospital; and (4) seeking its own certificate of need for installation of a CT-scanner at City Hospital through use of materially false statements about Potters and NCA. Vodrey and Schoolnic were alleged to have conspired with City Hospital in regard to these acts.
 
 
 8
 City Hospital sought a stay of this action pending the outcome of some relevant Ohio state court litigation (discussed infra in connection with our disposition of Potters' claims of sham activity). The request was denied on February 21, 1984, and each side began the discovery process with preparation of document production demands and interrogatories. However, Potters, NCA and BCB maintain that at an in-chambers status conference on March 9, 1984, which was unreported, the district court suspended discovery pending resolution of summary judgment motions which were to be submitted twenty days after the conference with the response due twenty days later. Although the precise nature of the order made by the district court is not clear from the record, some understanding to suspend discovery apparently existed because neither side thereafter responded to pending discovery requests nor sought compliance with its own requests. Defendants filed motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on March 29, 1984, with extensive supporting memoranda and affidavits. Plaintiffs responded in opposition with an extensive supporting memorandum and affidavits on April 23, 1984. On January 28, 1985, the district court granted summary judgment for City Hospital, Vodrey, and Schoolnic with respect to all counts of the complaint. Potters, NCA and BCB now appeal the district court's judgment in its entirety.
 
 II.
 
 9
 Summary judgment should be entered only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Both the Supreme Court and this circuit have stressed their reluctance to dispose of antitrust litigation on motions for summary judgment. See Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); Smith v. Northern Michigan Hospitals, Inc., 703 F.2d 942, 947 (6th Cir.1983). As stated in Poller:
 
 
 10
 Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.
 
 
 11
 368 U.S. at 473, 82 S.Ct. at 491.
 
 
 12
 This is not to say, however, that summary judgment should never be granted.
 
 
 13
 While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.
 
 
 14
 First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968), reh. denied, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968). Accordingly, to survive a defendant's motion for summary judgment the plaintiff must provide some factual basis from which elements of intent and conspiracy may be reasonably inferred. Cities Service, 391 U.S. at 290, 88 S.Ct. at 1593; Smith, 703 F.2d at 948. Once the movant has informed the district court of the basis for its motion, identifying those parts of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which it believes show the absence of a genuine material fact issue, the nonmovant must go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories, and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Rule 56(c), (e), Fed.R.Civ.P.; Celotex Corp. v. Catrett, --- U.S. ----, ----, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); see also Anderson v. Liberty Lobby, Inc., --- U.S. ----, ---- - ----, 106 S.Ct. 2505, 2509-12, 91 L.Ed.2d 202 (1986). The evidence must be viewed in a light most favorable to the party opposing summary judgment and that party must be given the benefit of all reasonable inferences. Matsushita Electric Industrial Co. v. Zenith Radio Corp., --- U.S. ----, ----, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); Bouldis v. U.S. Suzuki Motor Corp., 711 F.2d 1319, 1324 (6th Cir.1983). It is in light of these principles of summary judgment that we examine the district court's disposition of this case.
 
 Section 1 Claims
 
 15
 Section 1 of the Sherman Act, 15 U.S.C. Sec. 1, provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." A necessary element of establishing a Sec. 1 violation is proof of conspiracy or concerted activity. Section 1 does not reach unilateral conduct; only Sec. 2 governs conduct by a single actor. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767-68, 104 S.Ct. 2731, 2740-41, 81 L.Ed.2d 628 (1984). All but one of the allegations of Sec. 1 conspiracy name City Hospital, Vodrey, and Schoolnic as the conspirators. Vodrey, as noted above, is City Hospital's attorney and a member of its Board. Vodrey also has an ownership interest in a construction company which does work for City Hospital. Schoolnic is a City Hospital staff physician, chairs its Internal Medicine Department, and sits on City Hospital's Executive Committee. He also received revenue from City Hospital's use of EKG equipment he owned. Both Vodrey and Schoolnic are undisputedly agents of City Hospital.
 
 
 16
 We agree with the district court that as a matter of law Vodrey and Schoolnic lack the capacity to conspire with City Hospital. It is well settled that "officers or employees of the same firm do not provide the plurality of actors imperative for a Sec. 1 conspiracy." Copperweld, 467 U.S. at 769, 104 S.Ct. at 2741; see Smith, 703 F.2d at 950. The rationale is that officers or agents of a single firm share a unity of economic purpose with the firm, so that agreements, combinations or concerted actions among them do not impermissibly coalesce economic power that was previously directed toward divergent goals. Copperweld, 467 U.S. at 769, 104 S.Ct. at 2741. Because Vodrey and Schoolnic are officers and agents of City Hospital, they thus lack the capacity to conspire with City Hospital. Appellants, however, asserted that Vodrey and Schoolnic, by virtue of their respective ownership interests in the construction firm and the EKG equipment, hold "independent personal stakes" in destroying Potters and in seeing City Hospital attain its allegedly monopolistic goals. Although several courts have recognized the "independent personal stake" exception to the rule that officers and agents lack capacity to conspire with their corporation, see e.g., H & B Equipment Co. v. International Harvester Co., 577 F.2d 239, 244 (5th Cir.1978); Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir.1974); see also Johnston v. Baker, 445 F.2d 424, 427 (3d Cir.1971), this circuit has never endorsed the exception. In fact, this court has noted the "rather substantial policy reasons for not adopting such an exception." Smith, 703 F.2d at 950 n. 15. Even if we were to recognize this exception, appellants' argument would still fail. In cases accepting the theory of an independent personal stake, the agent or officer held capable of conspiring had both an independent personal stake in achieving the conspiracy's object as well as the power to institute the anti-competitive policy for his corporation. See Greenville, 496 F.2d at 399-400. A mere potential or indirect motive is too speculative a basis from which to infer an independent personal stake. Smith, 703 F.2d at 951. In the instant case, neither Vodrey nor Schoolnic have an independent personal stake in any of the four relevant markets in which there is an alleged conspiracy. Their stake, if any, lies only in the general success of City Hospital itself. "To apply this supposed exception for 'independent stake' to the present case would be paramount (sic) to allowing the exception to subsume the rule." Id. Second, neither has the power to institute the anti-competitive policy for City Hospital. The judgment of the district court with regard to Vodrey and Schoolnic is, therefore, affirmed. Since unilateral action does not state a Sec. 1 claim as a matter of law, Copperweld, 467 U.S. at 767, n. 13, 104 S.Ct. at 2740 n. 13, summary judgment is also affirmed with respect to the Sec. 1 claims against City Hospital which alleged Schoolnic and Vodrey as co-conspirators.
 
 
 17
 The only remaining Sec. 1 claim was City Hospital's alleged conspiracy with the Hospital Care Corporation (not a party to this action) to prevent Potters from obtaining a Blue Cross participating hospital contract, thereby limiting Potters' reimbursement from Blue Cross and discouraging hospital inpatient admissions. City Hospital expressly denied this allegation by way of sworn affidavit, stating that it had never to its knowledge communicated with the Hospital Care Corporation regarding Potters, and also introduced evidence that the Hospital Care Corporation denied Potters a contract due to its failure to meet statutory cost control objectives. The record reflects that Potters did not rebut City Hospital's affidavit nor provide any factual basis from which one could reasonably infer that a conspiracy existed; indeed, Potters did not even allude to this issue in its opposing memorandum. Under these circumstances, summary judgment was proper as to this last Sec. 1 claim. See Rule 56(e), Fed.R.Civ.P.; Celotex, --- U.S. at ----, 106 S.Ct. at 2552. In response to Potters' charge that dismissal was premature given the lack of discovery, we note that Potters could have availed itself of Rule 56(f), Fed.R.Civ.P., and filed affidavits "that [it] cannot for reasons stated present by affidavit facts essential to justify [its] opposition...." See Celotex, --- U.S. at ----, 106 S.Ct. at 2554; Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield of Michigan, Inc., 740 F.2d 423, 427 (6th Cir.1984).
 
 Section 2 Claims
 
 18
 Section 2 of the Sherman Act, 15 U.S.C. Sec. 2, provides: "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." The offenses of monopolization, attempt to monopolize, and conspiracy to monopolize are distinct and require different proofs.
 
 
 19
 Because Sec. 2 conspiracy to monopolize claims require proof of concerted activity, just as Sec. 1 conspiracy claims do, "[t]he claim of a conspiracy to monopolize fails for the same reason as did the appellants' section 1 claims...." Smith, 703 F.2d at 954. However, in reviewing the district court's disposition of the remaining Sec. 2 claims regarding monopolization and attempt to monopolize, which may be established through unilateral acts of City Hospital, we find that the district court committed a fundamental error. The district court analyzed City Hospital's alleged exclusionary conduct and Potters' evidence of such in a piecemeal fashion without first establishing an overall frame of reference. As aptly summarized in Smith, 703 F.2d at 954-55:
 
 
 20
 To establish the offense of monopolization a plaintiff must show that a defendant either unfairly attained or maintained monopoly power. United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). Monopoly power consists of "the power to control prices or exclude competition." Id. at 571, 86 S.Ct. at 1704.
 
 
 21
 An attempted monopolization occurs when a competitor, with a "dangerous probability of success," engages in anticompetitive practices the specific design of which are, to build a monopoly or exclude or destroy competition. See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); E. Kintner, Federal Antitrust Law, Vol II, Sec. 13.1, p. 406 (1980) (citing cases).
 
 
 22
 In order to succeed on either a monopolization or attempt to monopolize claim plaintiffs must establish the relevant product and geographic markets in which they compete with the alleged monopolizers. See, e.g., United States v. Grinnell Corp., 384 U.S. 563, 571-73, 86 S.Ct. 1698, 1704-05, 16 L.Ed.2d 778 (1966); Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 395-99, 396 n. 23, 76 S.Ct. 994, 1007-09, 1008 n. 23, 100 L.Ed. 1264 (1956); Times-Picayune, 345 U.S. at 611-12, 73 S.Ct. at 881-82 (1953).
 
 
 23
 Thus, before reaching the merits of an antitrust claim, it is necessary to identify the relevant markets, Smith, 703 F.2d at 954; United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir.1945), and in the case of the monopolization claim, whether the defendant enjoys monopoly power, Smith, 703 F.2d at 955. Because the district court erred in failing to undertake these necessary initial steps, summary disposition of these Sec. 2 claims was premature and we must remand the case for development of these relevant factors.
 
 
 24
 Despite the necessity of remand on this basis, we will review the district court's disposition of the Sec. 2 monopolization and attempt to monopolize claims in each of the alleged relevant markets[2] in order to assist the district court on remand, and because we can affirm summary judgment with respect to the claims of "sham" proceedings.
 
 Hospital Inpatient Services
 
 25
 Potters argued that City Hospital's alleged refusal to grant staff privileges to doctors with Potters' staff privileges was a Sec. 2 violation. The district court applied Southhaven Land Co., Inc. v. Malone & Hyde, Inc., 715 F.2d 1079, 1085 (6th Cir.1983) (citing Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 537-45, 103 S.Ct. 897, 908-12, 74 L.Ed.2d 723 (1983)), which outlined the factors relevant to the determination of standing to pursue antitrust claims as:
 
 
 26
 (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.
 
 
 27
 Under the Southhaven analysis, the district court found that Potters lacked standing because the only competition directly restrained was that between doctors, not hospitals; that Potters' claimed injuries of "lost admissions" and "lost revenues" were indirect; and that Potters' damages were speculative.
 
 
 28
 We believe that the district court erred in so finding. It is necessary to ascertain first whether City Hospital's alleged efforts to restrict staff privileges could constitute an act of monopolization; i.e. "the use of monopoly power to foreclose competition or gain a competitive advantage that is unlawful." Borden, Inc. v. FTC, 674 F.2d 498, 513 (6th Cir.1982), vacated on other grounds, 461 U.S. 940, 103 S.Ct. 2115, 77 L.Ed.2d 1298 (1983). Importantly, such acts need not "be in themselves independently unlawful." Id. A relevant inquiry is whether the alleged conduct is exclusionary in that it "not only ... tends to impair the opportunities of rivals, but also ... either does not further competition on the merits or does so in an unnecessarily restrictive way." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 2859 n. 32, 86 L.Ed.2d 467 (1985) (quoting 3 P. Areeda and D. Turner, Antitrust Law 78 (1978)). There is evidence that City Hospital's alleged conduct in restricting privileges could state a monopolization claim. As City Hospital's own memorandum in support of its summary judgment motion recognized: "City Hospital admits patients only through physicians, such that the more physicians it has on staff, the more admissions it will receive. In this sense, City Hospital and Potters actually compete for physicians, not patients." Conversely, one can infer that the fewer physicians a hospital has on staff, the fewer admissions for inpatient services it will realize. In this context, the record demonstrates that these two hospitals compete for scarce resources. Further, it is not unreasonable to assume that doctors, if they felt compelled to choose between Potters and the much larger, dominant City Hospital, would likely opt for the latter. It is conceivable that City Hospital sought to restrict physicians' staff privileges in order to foreclose competition from Potters in the hospital inpatient services market.
 
 
 29
 Under the first Southaven factor, there would be a causal connection between the alleged antitrust violation--restriction of staff privileges--and the harm--corresponding reduction of Potters' staff physicians, admissions and revenue--to Potters. In addition, Potters alleged that City Hospital intended to harm Potters through this practice and submitted doctors' affidavits which indicated that City Hospital was hostile and "at all-out war with Potters." Under the second Southaven factor, Potters is clearly a competitor in the alleged relevant market of hospital inpatient services. As to the third factor, we disagree with the district court's conclusion that Potters' alleged injuries of lost admissions and revenues are indirect. If, as City Hospital stated, patients can only be admitted by a doctor with staff privileges, then lost admissions and revenues could be a direct result of a policy which seeks to limit the number of doctors with privileges at Potters. It is true that physicians may be directly injured by such a policy, as the district court found, but this does not mean that Potters' injury is necessarily less direct or is not "inextricably intertwined with the injury" City Hospital allegedly sought to inflict. See Associated General Contractors, 459 U.S. at 538, 103 S.Ct. at 908 (citing Blue Shield of Virginia v. McCready, 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982)). It is also true that Potters' damages may be somewhat speculative, but this is often the case in complex antitrust litigation and should not in itself foreclose antitrust standing. See P. Areeda and D. Turner, Antitrust Law p 343-44 (1978). Because Potters is a direct victim of the alleged antitrust violation, the risk of duplicative recovery which may occur when more indirect parties sue is also diminished.
 
 
 30
 The district court disposed of Potters' claim that City Hospital threatened and intimidated its own staff physicians not to seek privileges at Potters on the same ground of lack of standing. The concerns articulated above apply with equal force here. In addition, Potters submitted affidavits of doctors which supported its allegation that City Hospital sought primarily to harm Potters, not doctors, by restricting privileges.
 
 
 31
 Potters further alleged that City Hospital required restrictive contracts with some staff physicians that unfairly and unnecessarily prevented them from dealing with Potters or admitting patients at Potters. City Hospital has a "physician recruitment" program to attract physicians to the East Liverpool area. In exchange for certain bonuses and salary guarantees, the recruited physicians must agree to admit patients only to City Hospital and to be on staff only at City Hospital for a period of three years. The district court granted summary judgment for City Hospital on this claim, concluding that the contracts in question "did not impose an unreasonable restraint on trade." Such "restraint of trade" language is relevant only to Sec. 1 Sherman Act violations; it appears therefore that the district court never fully analyzed this claim under Sec. 2 standards. In addition, the district court's conclusion rested heavily on Robinson v. Magovern, 521 F.Supp. 842 (W.D.Pa.1981), aff'd, 688 F.2d 824 (3d Cir.), cert. denied, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982), in which the court held that a non-monopolist hospital's policy of restricting staff appointments to very highly qualified applicants did not impose an unreasonable restraint on trade, because by building a high quality staff the hospital would improve its competitive posture, thereby increasing competition in the relevant market. However, the case on appeal involves an alleged monopolist, so that the relevance of Robinson is questionable at best. Although City Hospital advanced a non-competitive purpose for these contracts (to attract qualified physicians to the geographic area), Potters also put forth evidence that City Hospital wanted to maintain its monopoly position and that it was hostile to any competition from Potters. City Hospital also asserted that their doctors always have had the freedom to consult with Potters' physicians or to refer patients to Potters' physicians. However, City Hospital's alleged coercion and pressure not to do business with Potters (corroborated by affidavits) would interfere with the independence of physicians' decisions in this area. As such, it was improper to dispose of this claim on a summary judgment motion; it was impossible, without impermissibly weighing the evidence and prior to discovery, to conclude that City Hospital did not have an anticompetitive intent in entering into these restrictive contracts.
 
 
 32
 Appellants finally alleged that City Hospital monopolized or attempted to monopolize certain markets by opposing Potters' Sec. 1122 application and by participating in other sham activity. Shortly after opening its facility, Potters applied to the Ohio Department of Health (ODH) for reimbursement of certain capital expenditures. Section 1122 of the Social Security Act, 42 U.S.C. Sec. 1320a-1, required hospitals to obtain approval for such reimbursement from the state's health systems agency. This was to assure that Federal funds were "not used to support unnecessary capital expenditures made by or on behalf of health care facilities...." 42 U.S.C. Sec. 1320a-1(a). ODH forwarded a copy of Potters' application to the Health Systems Agency of Eastern Ohio (HSAEO) for its recommendation. HSAEO, as part of its review process, requested eastern Ohio hospitals to comment on Potters' application. Seven, including City Hospital, suggested that Potters was duplicating available health care services. Thereafter, HSAEO recommended denial of the application; ODH adopted the recommendation.
 
 
 33
 As a result of this decision the Hospital Care Corporation rejected Potters' separate efforts to receive a Blue Cross participating hospital contract. Under Ohio Rev. Code Sec. 1739.06, then in effect, a hospital service organization, such as Blue Cross, could not contract with a hospital which failed to comply with statutory cost control objectives, one of which was the "[e]limination of duplicative or unnecessary services...." See Ohio Rev. Code Sec. 1739.01(M)(1). Potters appealed the denial to the Ohio Superintendent of Insurance; the Superintendent affirmed, as did the Franklin County Court of Common Pleas and the Ohio Court of Appeals. However, the Ohio Supreme Court reversed, holding that Blue Cross and the Superintendent of Insurance had to make independent determinations regarding cost containment objectives and could not simply rely on HSAEO's action. Potters Medical Center, Inc. v. Ratchford, 18 Ohio St.3d 253, 255-56, 480 N.E.2d 789 (1985).
 
 
 34
 In 1982 NCA acquired a CT-scanner and BCB began construction of an emergency care facility. Under Ohio "certificate of need" (CON) laws, a "health care facility" (e.g. a hospital) cannot undertake major capital expenditures, such as purchase of a CT-scanner or a building program, without first obtaining a CON. Ohio Rev. Code Sec. 3702.63(A), (B). The purpose of the CON laws is cost containment and prevention of duplicative services. The City Hospital Executive Committee was concerned that this expansion would duplicate existing and underutilized facilities at City Hospital. City Hospital wrote ODH expressing its belief that Potters was using its alleged affiliates, BCB and NCA, to circumvent CON laws. ODH requested the Ohio Attorney General's action on the matter. In 1983 the Attorney General filed suit in the Columbiana County Common Pleas Court against Potters; City Hospital was granted leave to intervene as a plaintiff. On May 2, 1983, the common pleas court, finding that Potters had attempted to circumvent CON laws, entered a preliminary injunction stopping BCB's emergency care facility construction until it complied with CON laws. The Ohio Court of Appeals, Seventh District, stayed the injunction. The injunction was temporarily suspended pursuant to a writ of supersedeas by the Ohio Supreme Court, which subsequently dismissed the appeal for lack of a final order. The record does not indicate the current status of this litigation.
 
 
 35
 Potters has contended that the district court erred in finding that City Hospital's involvement and/or instigation of such activity was insulated from antitrust liability by the Noerr-Pennington doctrine. Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In Noerr and Pennington, the Supreme Court held that attempts to influence the legislative process, even if prompted by an anticompetitive intent, are immune from antitrust liability. This doctrine rests on two grounds: the First Amendment's protection of the right to petition the government, and the recognition that a representative democracy, such as ours, depends upon the ability of the people to make known their views and wishes to the government. Noerr, 365 U.S. at 137-38, 81 S.Ct. at 529-30. In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), the Supreme Court extended the protection of the Noerr-Pennington doctrine to efforts to influence administrative agencies and the courts. California Motor Transport also elaborated on the sham exception first alluded to in Noerr that some activity, ostensibly directed toward influencing governmental action, may be merely a "sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," so as to justify application of the Sherman Act. Noerr, 365 U.S. at 144, 81 S.Ct. at 533. California Motor Transport recognized that "unethical conduct in the setting of the adjudicatory process" or the pursuit of "a pattern of baseless, repetitive claims" is unprotected by the Noerr-Pennington doctrine; such conduct "constitutes an abuse of [governmental] processes ... effectively barring a competitor's meaningful access to the courts or agencies." 404 U.S. at 512-13, 92 S.Ct. at 612-13; accord Otter Tail Power Co. v. United States, 410 U.S. 366, 380, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1973).
 
 
 36
 Potters has argued that City Hospital's conduct falls within the sham exception, and that the district court impermissibly weighed issues of fact in granting summary judgment for City Hospital on this issue. We disagree. Our careful review of the entire record shows that City Hospital's activities were precisely the type of conduct intended to be insulated by Noerr-Pennington.
 
 
 37
 With regard to Potters' Sec. 1122 application, we observe that City Hospital's comments were solicited by the HSAEO, the governmental agency responsible for local health planning. The Sec. 1122 scheme anticipates such participation by private health care providers. Hospital Building Co. v. Trustees of Rex Hospital, 691 F.2d 678, 685 (4th Cir.1982), cert. denied, 464 U.S. 890, 104 S.Ct. 231, 78 L.Ed.2d 224 and 464 U.S. 904, 104 S.Ct. 259, 78 L.Ed.2d 244 (1983). City Hospital's comments that Potters' services would be duplicative and of marginal benefit to the community were typical of comments received from other eastern Ohio hospitals and therefore cannot be said to be "baseless." Moreover, City Hospital's view was adopted by the HSAEO and ODH, which rejected Potters' application. The conclusion that City Hospital did not engage in a "sham" by participating in this administrative process is reinforced by the very fact that its position prevailed. Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1257 (9th Cir.1982), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); Taylor Drug Stores v. Associated Dry Goods Corp., 560 F.2d 211, 213 (6th Cir.1977); P. Areeda, Antitrust Law p 203.1 (1982 Supp.)
 
 
 38
 Similarly, we find no merit in Potters' allegation that a material fact issue existed as to whether City Hospital's participation in the CON litigation was sham activity. Potters argued that City Hospital's own evidence submitted with its summary judgment motion raised inferences of sham activity. The affidavit of Bruce Nielsen, City Hospital's president and chief executive officer, accompanied by copies of Board of Trustees meetings and correspondence with ODH reveals that City Hospital was concerned that BCB's and NCA's proposed expansions would unnecessarily duplicate existing facilities and that Potters was trying to circumvent Ohio CON laws through BCB and NCA. As a result, by City Hospital's own admission, it filed a formal protest with ODH regarding the expansion and requested ODH to determine whether Potters had to obtain a CON for BCB's expansion, citing news articles and other information in which BCB was represented as an affiliate of Potters and that the expansion was part of Potters' growth. Thereafter, ODH, which twice previously had requested Potters to clarify its relationship with BCB, requested the Ohio Attorney General to commence legal action against Potters. The Board minutes also reflect that City Hospital representatives planned to meet with the Ohio Attorney General to express their concerns and to request injunctive relief pending CON review and approval. As noted above, the Ohio Attorney General was successful in obtaining a preliminary injunction. Although the Ohio Court of Appeals for the Seventh District stayed the injunction as it pertained to construction of the emergency facility, use or occupancy of the facility was prohibited pending a final determination or further order of the Court. Thereafter, Potters did request CON review of both the CT-scanner and emergency center project. ODH found that the CT-scanner was purchased on Potters' behalf and subject to CON requirements. It found the emergency center project to be non-reviewable, but attached specific conditions which had to be followed to preclude future review.
 
 
 39
 On these undisputed facts, City Hospital's conduct did not rise to "a pattern of baseless, repetitive claims" or "abuse of processes" necessary to constitute sham activity, California Motor Transport, 404 U.S. at 513, 92 S.Ct. at 613, or even create an inference of such. City Hospital was exercising its First Amendment right to petition the government; even if its conduct was accompanied by an "overall intent" that was "anti-competitive" and "hostile" as charged in Potters' brief, such advocacy was precisely the type of conduct protected by the Noerr-Pennington doctrine. "[I]nsofar as [its] campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." Noerr, 365 U.S. at 139-40, 81 S.Ct. at 530-31; see also Westmac, Inc. v. Smith, 797 F.2d 313 (6th Cir.1986); City of Cleveland v. Cleveland Electric Illuminating Co., 734 F.2d 1157, 1162 (6th Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).
 
 
 40
 Without a doubt, the intention to harm a competitor is not sufficient to make litigation or administrative proceedings a sham. That anticompetitive motive is the very matter protected under Noerr-Pennington. Rather, the requisite motive for the sham exception is the intent to harm one's competitors not by the result of the litigation but by the simple fact of the institution of litigation.
 
 
 41
 MCI Communications Corp. v. American Telephone & Telegraph Co., 708 F.2d 1081, 1156 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (quoting Gainesville v. Florida Power & Light Co., 488 F.Supp. 1258, 1265-66 (S.D.Fla.1980) (emphasis in original)). The evidence shows that City Hospital was essentially asking that Potters be required to comply with the same regulations with which City Hospital was required by law to comply; on such facts, the sham exception does not apply. Assigned Container Ship Claims, Inc. v. American President Lines, Ltd., 784 F.2d 1420, 1424 (9th Cir.1986). As we noted above, the relative success of City Hospital's efforts also strongly suggests that its actions were not the "baseless" sort of conduct to which the sham exception applies, Taylor Drugstores, 560 F.2d at 213; c.f. Landmark's Holding Corp. v. Bermant, 664 F.2d 891, 896-97 (2d Cir.1981) (summary judgment for defendants was reversed where record showed they filed meritless appeals (all of which they lost) knowing they lacked standing to so appeal and deliberately protracted proceedings by misrepresenting to the Connecticut Supreme Court that they needed extra time, acknowledging in their own files that the request was "purely bull"), although success is not necessarily a prerequisite for receiving protection under the Noerr-Pennington doctrine.
 
 Minor Emergency Services
 
 42
 Aside from the allegation that City Hospital engaged in sham activity in this market in order to suppress competition by BCB, which must fail for the reasons stated above, Potters alleged that City Hospital intimidated and coerced Dr. Castillo who stated his intent to open and operate the competing minor emergency services facility. Such conduct, if established, could indicate exclusionary motives; however, Nielsen's affidavit submitted on behalf of City Hospital attests that City Hospital had no knowledge of Castillo's intent until after his resignation. Castillo's letter of resignation and his affidavit are silent on this particular point. Because Potters put forth no evidence relating to this claim, summary judgment was proper. See First National Bank, 391 U.S. at 290, 88 S.Ct. at 1593; Smith, 703 F.2d at 948; Fed.R.Civ.P. 56(e).
 
 Outpatient Pathology Services
 
 43
 Potters alleged that City Hospital possessed a legal monopoly, but unlawfully sought to maintain the monopoly and foreclose competition by coercing and intimidating doctors not to refer outpatient pathology services business to Potters and by offering improper incentives to refer such work to City Hospital. The district court granted summary judgment for City Hospital on the basis that City Hospital's restrictive contract with its chairman of pathology services, which guaranteed his full-time commitment to quality pathology services at City Hospital, did not constitute an unreasonable restraint of trade. "Restraint of trade" analysis relates to a Sec. 1 violation and is not responsive to the Sec. 2 violation alleged. Second, the district court's cursory disposition of this claim totally ignored Potters' distinct allegations that City Hospital coerced physicians not to direct outpatient pathology business to Potters and offered improper incentives for referrals to City Hospital. City Hospital never responded to this allegation, but only noted the reasons for its restrictive contracts with the pathology services chairman. In view of this and Potters' evidence of City Hospital's alleged pressuring tactics, summary judgment was improper as to this claim.
 
 Diagnostic Imaging Services
 
 44
 Appellants alleged that City Hospital unlawfully sought to maintain its monopoly over radiology services, and attempted to monopolize CT-scanning services. First, they asserted that City Hospital unreasonably refused NCA physicians staff privileges, thereby depriving NCA and Potters of patient referrals and revenues. The district court found that Potters and NCA lacked standing to bring this claim. For the same reasons set forth in our discussion of standing to bring claims relating to hospital inpatient services, this finding was erroneous. Appellants also alleged that City Hospital coerced and harassed physicians not to refer patients to Potters and NCA, compelled CT-scanning patient referrals to providers other than NCA, and unfairly restricted the ability of NCA physicians to consult with, or provide services to, patients admitted to City Hospital. The district court also disposed of these claims on the basis that Potters lacked proper standing to assert them. We disagree for the same reasons set forth in our discussion of the similar claims made with respect to the outpatient pathology services market. In addition, we note that Potters' affidavits presented evidence and raised inferences that City Hospital pressured doctors with the intent to harm Potters and NCA. Summary judgment was thus premature with respect to this claim.
 
 
 45
 Finally, appellants charged that the district court erroneously entered summary judgment with regard to the allegation that City Hospital's CON application for its own CT-scanner contained materially false statements about Potters and NCA. As the district court stated, the knowing and willful submission of false facts to a government agency falls within the sham exception to the Noerr-Pennington doctrine. Rex Hospital, 691 F.2d at 687; Clipper Exxpress, 690 F.2d at 1260-62. Such knowingly false submissions or intentional misrepresentations constitute an abuse of government processes, analogous to the antitrust violation which occurs when one procures a patent through fraud on the patent office. Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Only known falsity supports an antitrust offense. In this connection we approve the reasoning that "[w]ithout knowing falsity, ... there would not be the 'abuse' of government process which is the key to ousting Noerr and finding antitrust liability." P. Areeda, Antitrust Law p 204.1b (1982 Supp.). See also Frances H. Miller, "Antitrust and Certificate of Need: Health Systems Agencies, the Planning Act and Regulatory Capture." 68 Geo.L.J. 873, 901 n. 193 (1980) (citing Israel v. Baxter Laboratories, Inc., 466 F.2d 272, 277 (D.C. Cir.1972) and Woods Exploration and Producing Co. v. Aluminum Co. of America, 438 F.2d 1286, 1297 (5th Cir.1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972)). City Hospital presented the affidavit of Timothy Coughlin, its vice president for administrative services, which attested that City Hospital knowingly made no false statements about Potters or NCA in its CON application, that City Hospital asked Potters and other CT-scan providers to make available fee information, and that only Potters refused, so that City Hospital in good faith compiled data relating to Potters based on its own research. Once City Hospital put forth this affidavit, under Rule 56(e), Potters had to establish a factual issue by offering some evidence that City Hospital knowingly misrepresented Potters' fees. Potters made no such showing nor availed itself of Rule 56(f), Fed.R.Civ.P. Therefore, we affirm the district court's grant of summary judgment with regard to these claims.
 
 III.
 
 46
 Although the district court correctly found that Vodrey and Schoolnic could not conspire as a matter of law, that summary judgment was warranted in the Blue Cross conspiracy claim, and that City Hospital's involvement in litigation and administrative proceedings was insulated by the Noerr-Pennington doctrine, the district court erred in its analysis of the remaining Sec. 2 claims. The district court failed to identify the relevant markets and whether City Hospital was, indeed, a monopolist in certain markets as alleged by Potters. Moreover, in analyzing the items of conduct alleged to evidence City Hospital's exclusionary intent the district court either disregarded genuine issues of material fact raised thereby or erroneously disposed of the claims by applying an overly restrictive view of standing. This case, like most antitrust cases, is one in which "motive and intent play leading roles," Poller, 368 U.S. at 473, 82 S.Ct. at 491; Potters' affidavits and evidence presented facts from which one could infer the existence of exclusionary motive and intent. Therefore, summary judgment was inappropriate and discovery should proceed for further development of the facts. It may well be that after discovery the district court can properly determine that no genuine issues of material fact with respect to some allegations remain for trial, but Potters is entitled on the basis of the evidence thus far presented to proceed with discovery and to try to prove its case. We therefore reverse the judgment of the district court and remand this case for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Benjamin F. Gibson, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 Alexander Fisher, M.D., a physician with staff privileges at City Hospital, was also named as a defendant; however, he died shortly after initiation of this action and plaintiffs did not oppose a motion by Fisher's estate to dismiss claims against him
 
 
 [2]
 We note that City Hospital has not challenged Potters' characterization of the relevant markets, City Hospital's monopoly in some of the markets, and that Potters competes in those markets. We also acknowledge that due to the state of the record we have little information regarding the particular market forces at work in the health care services industry and the markets in issue