Robert D. STRATMORE,
Plaintiff–Appellant,

v.

Michael H. GOODBODY, Shareef Dancer (USA) Syndicate, Dalham Hall Stud, and Robert Acton, Defendants–Appellees.

No. 88–5130.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 28, 1988.

Decided Jan. 23, 1989.

Merl O. Barns, Joseph M. Alioto (argued), Alioto & Alioto, San Francisco, Cal., David T. Enlow, Murphy, King, Enlow & Dunn, Lexington, Ky., Daniel R. Shulman, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for plaintiff-appellant.

John S. Reed, Hirn, Reed, Harper & Eisinger, Louisville, Ky., Danny C. Reeves, Greenebaum, Doll & McDonald, Lexington, Ky., Richard J. Flynn (argued), Stephen S. Hill, R. Merinda Wilson, Gerald G. MacDonald, Sidley & Austin, Washington, D.C., for defendants-appellees.

Before KENNEDY, GUY and RYAN, Circuit Judges.

KENNEDY, Circuit Judge.

Plaintiff-appellant Robert D. Stratmore appeals the grant of summary judgment to defendants-appellees, the Shareef Dancer horsebreeding syndicate and its officers, in this antitrust action. The District Court rejected plaintiff's claim that the "no auction" clause in defendants' Syndicate Agreement violated Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as two pendent state law claims alleging tortious interference with contractual relations and interference with prospective advantage. We find that summary judgment was properly granted; there was no genuine issue of material fact and defendants were entitled to judgment as a matter of law. Defendants did not engage in any *per se* illegal activity, there was no appreciable suppression of competition under a rule of reason analysis, and the requisite elements of the Kentucky law tort claims were not met. We affirm.

I

Shareef Dancer, a thoroughbred stallion, was the object of a syndication agreement. The Syndicate is an unincorporated association formed under English law, and is composed of forty "shares" (initially valued at $1,000,000 each) of undivided ownership interests. Each share entitles a member of the Syndicate to breed a mare with Shareef Dancer every season over the stallion's life. The Syndicate Agreement allows members to sell either shares or breeding rights for a single season (also known as a "nomination"), subject to ¶ 13(d), which provides, "At no time shall any share or nomination be sold at auction."

This case arises from plaintiff's attempt to auction a Shareef Dancer nomination for the 1986 season. In February 1985, Stratmore purchased the nomination for $102,000 on the weekly Matchmaker Breeders' Exchange, a private organization. He intended to resell it at Matchmaker's November 1985 auction, and signed a contract setting a reserve price of $125,000. Stratmore notified the Syndicate of his plans to auction the nomination, and was informed that this violated the Syndicate Agreement.

Goodbody, chairperson of the Syndicate's oversight committee, also notified Matchmaker of the violation of the "no auction" clause after Stratmore refused to withdraw the nomination. Matchmaker itself withdrew the nomination from auction; it had a policy to abide by the terms of syndicate agreements, and its rules also required members to purchase only for breeding purposes and not for resale. This left plaintiff with the alternatives of selling the nomination through listing it on Matchmaker's weekly bid-and-asked exchange, through a bloodstock agent, through advertisements in newspapers and trade journals, and other private contacts. Beginning in November 1985, he listed the nomination on Matchmaker's weekly exchange for several weeks. He initially asked for $125,000, but received no offers despite reducing the listing price, and finally sold the nomination privately for $90,000 in February 1986.

Plaintiff's complaint, filed on November 8, 1985, alleged a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, as "a contract, combination, and conspiracy to fix and stabilize prices for shares and nominations of thoroughbred stallions." He also alleged tortious interference with contractual relations and interference with prospective advantage under Kentucky common law. After extensive discovery, both parties filed motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P. The District Court denied plaintiff's motion for partial summary judgment, and granted defendants' motion for summary judgment on all claims. We agree with the District Court that this is not a price fixing or price stabilization case, which would be illegal *per se,* and that the "no auction" clause did not have an unlawful purpose or anticompetitive effect under a rule of reason analysis. We also agree that plaintiff has failed to establish the elements of his state law tort claims.

## II

Summary judgment is granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the District Court explains at length, the Supreme Court and this Court have tempered a "reluctance" to grant summary judgment in antitrust litigation, *Potters Medical Center v. City Hospital Ass'n,* 800 F.2d 568, 572 (6th Cir.1986), with the recognition that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules...." *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence must be viewed in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *Matsushita Electric,* 475 U.S. at 587, 106 S.Ct. at 1356; *Potters Medical Center,* 800 F.2d at 572. The District Court correctly applied summary judgment procedure in deciding this case.

## III

■ Section 1 of the Sherman Act proscribes every contract, combination, or conspiracy in restraint of trade or commerce. 15 U.S.C. § 1. As we stated in *Continental Cablevision of Ohio, Inc. v. American Electric Power Co.,* 715 F.2d 1115 (6th Cir.1983), a plaintiff must prove two essential elements to establish a section 1 violation: (1) that defendants entered into a contract, combination, or conspiracy; and (2) that such contract combination or conspiracy amounted to an unreasonable restraint of trade. *Id.* at 1118. "In essence, plaintiffs must demonstrate that the alleged ... conspiracy had either an unlawful purpose or an anticompetitive effect." *Id.* citing *United States v. United States Gypsum Co.,* 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978).

### A

■ The threshold requirement under *Continental Cablevision* is proof of con-

certed action; unilateral conduct is not sufficient. *See Potters Medical Center*, 800 F.2d at 573. As with the District Court, we need not decide whether the Shareef Dancer Syndicate, which is an unincorporated association formed under English law providing forty undivided interests in a single horse, represents concerted or unilateral conduct. While the law is clear that a *corporation* and its officers do not engage in concerted action within the meaning of section 1, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *Potters Medical Center*, 800 F.2d at 573, the status of an unincorporated association is murkier. *See* E.W. Kintner, Federal Antitrust Law § 9.14 (1980) ("Though partnerships have been treated as a single 'person' within the meaning of Section 1, it is clear that the partnership form alone will not save the participating partners from what would otherwise be an unlawful conspiracy in restraint of trade."). The record does not show a genuine issue of material fact on either unlawful purpose or anticompetitive effect under the second prong of the *Continental Cablevision* test regarding defendants' "no auction" clause. For this reason, we leave the nature of a horse-breeding syndicate's ability to conspire in violation of section 1, for another day.

### B

Beyond the threshold, a plaintiff must prove that the alleged combination or conspiracy had an unlawful purpose or an anticompetitive effect. *Continental Cablevision*, 715 F.2d at 1118. Plaintiff argues that we should employ a *per se* analysis because defendants conspired "to fix and stabilize prices for Shareef Dancer shares and nominations." To hold that defendants' "no auction" clause constitutes price fixing or stabilization, and is thus a *per se* violation of section 1, would stretch the doctrine far beyond its outer limits. We reach this conclusion for three reasons. First, plaintiff has failed to show that proscribing sales at Matchmaker's auction allows the Syndicate to fix or stabilize prices. Second, Matchmaker's "public auction" is actually private. A number of equally ac-

cessible sales channels for a nomination exist, including Matchmaker's weekly bid-and-asked listing, which reaches more members than its "public" auction. Third, plaintiff has failed to demonstrate an injury even under a *per se* analysis. We consider below each of these reasons.

Plaintiff has not shown that the Syndicate's "no auction" clause allows it to fix or stabilize prices. The District Court notes that "the record [does not] reflect any attempt by the syndicate or its agents to control the manner in which—except in regard to an auction—the price at which a season was sold." There is no evidence that the syndicate ever disapproved the prices arrived at in individual, private transactions. This case simply does not fit the paradigmatic example of price stabilization in which firms exchange price information in order to stabilize the price, thereby interfering with price setting by free market forces. *See United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). In fact, it is just as likely that an *auction* would serve to stabilize prices. In a series of individually negotiated transactions, buyers and sellers will set differing prices for each nomination. In contrast, an auction with a number of Matchmaker's private members present may result in a consensus value for a particular stallion's nomination.

Plaintiff's efforts to characterize this as a price *stabilization* case appear to be an attempt to escape the rule that there is no antitrust injury if a conspiracy actually tends to *benefit* a plaintiff. The Supreme Court has stated:

To survive petitioners' motion for summary judgment, respondent must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; *they must show an injury to them resulting from the illegal conduct....* Except for the alleged conspiracy to monopolize the American mar-

ket through predatory pricing, these alleged conspiracies could not have caused respondents to suffer an "antitrust injury," because they *actually tended to benefit respondents.*

*Matsushita Electric,* 475 U.S. at 585–86, 106 S.Ct. at 1355–56 (citations omitted; emphasis added). Plaintiff has pointed to no evidence on why the Syndicate would want to keep prices unnaturally low, or stabilized, and unnaturally *high* prices which might result from lack of public markets (which in any event do not exist for nominations) do not cause antitrust injury to sellers.

A second consideration militating against *per se* analysis is the fact that Matchmaker's auction is *private.* The auction is limited to Matchmaker's members; it is not "a free, open, competitive sales arena." Also, the auction rules allow for manipulation of the market. An owner can surreptitiously bid on his own horse, and preferred customers can "bump" average customers. Plaintiff has not shown that there is a genuine issue of material fact over whether Matchmaker's auction is "the most price sensitive market available." There are alternative sales channels which are equally open and accessible.

One of the major alternatives to an auction is Matchmaker's weekly exchange, which lists horses on a bid-and-asked basis. The exchange is open to the same members as the auction, and the results of those sales are made public. *Id.* We find unpersuasive plaintiff's argument that " 'Being there and seeing something once in person is more valuable than reading about it 100 times.' " Market forces of supply and demand operate in the exchange listing to the same extent as the auction, given that both are open to the same membership. Also, plaintiff had several selling channels in addition to the listings in Matchmaker's weekly exchange. These alternatives included sales through a bloodstock agent, through advertisements in newspapers and trade journals, and other private contacts. Such contacts are no more "private" than Matchmaker's members-only auction.

■ Lastly, plaintiff has not shown damages. His inability to find a buyer through any sales channels until he reduced the nomination to $90,000 indicates that he did not suffer an injury even under a *per se* analysis. After plaintiff failed to sell his nomination privately before the auction for $150,000, he listed it on Matchmaker's weekly exchange for $125,000 in November 1985. He was unable to find a buyer at that price, and reduced his asking price several times but was still unsuccessful. Stratmore eventually sold the nomination privately for $90,000 in February 1986. The only two instances in which a Shareef Dancer 1986 nomination was sold for more than $100,000 involved special circumstances. One sale was agreed to in 1983 as an inducement to sell a share, and the other involved a swapping arrangement in which the selling party agreed to purchase a future nomination at the same price. Under these circumstances, the District Court was justified in granting summary judgment on plaintiff's inability to show injury even under a *per se* analysis. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). This is not, however, a *per se* case.

### C

■ In order to prevail in the absence of *per se* liability, plaintiff has the burden of showing an unreasonable restraint of trade. *See Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984). As we noted above, *Continental Cablevision* and the Supreme Court cases require an examination of unlawful purpose or anti-competitive effect. The record discloses no genuine issue as to either. As to purpose, the "no auction" clause serves the important purpose of insuring that the Syndicate has control over the quality of mares which breed with Shareef Dancer. The Syndicate members have collectively invested $40 million in a single asset, the stallion itself, and

the value of their investment depends on producing a quality foal. Likewise, the "no auction" clause does not have an unreasonable anticompetitive effect in light of the surrounding circumstances. *See Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed. 2d 48 (1982); *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 690–91, 98 S.Ct. 1355, 1364–65, 55 L.Ed.2d 637 (1978).

The starting point in a rule of reason case is to identify the relevant product and geographic markets. *See* W.C. Holmes, 1988 Antitrust Law Handbook, § 1.04[2], at 148–50. The relevant market is used to gauge market power, which in turn indicates the potential anticompetitive effect of a challenged restraint. This contrasts starkly with *per se* analysis, under which a determination of the relevant market is not significant. *See Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (The "principle of *per se* unreasonableness ... avoids the necessity for an incredibly complicated and prolonged economic investigation...."). In this case, the relevant product market does not require a complex investigation and is dispositive.

The Supreme Court has explained "that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." 435 U.S. at 691, 98 S.Ct. at 1365. The District Court found "no appreciable suppression of competition," even when narrowly defining the relevant product market as nominations of Shareef Dancer. Broadening the relevant product market to thoroughbred stallion nominations, the court found the anticompetitive effect to be "negligible." We agree. Regardless of how the market is defined, the "no auction" clause cannot conceivably have the requisite anticompetitive effect given that it is limited to one thoroughbred stallion. We need not address the relevant geographic market, given the clear nature of the product market. Because plaintiff was unable to show a genuine issue of material fact on suffering injury, defendant has not violated section 1

under *either* a *per se* or a rule of reason approach. Plaintiff likewise failed to meet his burden on the state law tort claims.

## IV

The District Court also granted summary judgment in favor of defendants on plaintiff's Kentucky law tort claims of interference with contractual relations and interference with prospective advantage. Both claims fail given our finding that there was no antitrust violation. In particular, plaintiff has failed to show a genuine issue of material fact on the issue of damages, which is an essential element in any tort claim.

## A

Under Kentucky common law, intentional interference with contractual relations gives rise to a tort action if it is malicious or without justification. *Davis H. Elliot Co. v. Caribbean Utilities Co.*, 513 F.2d 1176, 1182 (6th Cir.1975). The Court of Appeals of Kentucky has more recently expanded on this, stating that "no action lies in Kentucky for such a breach unless the inter-meddler employs unlawful means, such as fraud, deceit, or coercion." *Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 425 (Ky.App.1978). Naturally, the basic tort elements of duty, breach, causation, and damages must all be proven. *See* Prosser & Keeton, Law of Torts, § 30, at 164 (5th ed. 1984); *Henderson v. Milobsky*, 595 F.2d 654, 658 n. 22 (D.C.Cir.1978) (citing Prosser).

Plaintiff alleges that defendants "knowingly and without privilege or justification interfered with and caused Matchmaker to breach [its] contract" with plaintiff. The claim is based on a telex from Goodbody, the Syndicate chairperson, to Matchmaker: "I am sure that we will have the full cooperation of Matchmaker in the event of Mr. Stratmore deciding to go ahead and offer this season for sale." While it is clear that Matchmaker withdrew plaintiff's nomination from auction, it is *not* clear either that Matchmaker breached its contract, or that

the withdrawal resulted from "unlawful means" by the Syndicate.

To tortiously interfere requires "the existence of a contract between the plaintiff and a third party and a subsequent breach of the contract by the third party." *Industrial Equipment Co. v. Emerson Elec. Co.*, 554 F.2d 276, 289 (6th Cir.1977). The District Court found that Matchmaker did not breach its contract because its contract with plaintiff gave it " 'the right to refuse a consignment of any share or season ... for any reason which in its sole discretion it deems appropriate.' " In this case, there is convincing evidence that Matchmaker withdrew the nomination not because the telex was coercive, but because the telex made it aware of plaintiff's breach of the Syndicate Agreement. The head of Matchmaker, Mr. Weisbord, testified that it was company policy to respect the terms of syndicate agreements. The policy is based on their desire to avoid litigation. Given our earlier conclusion that the "no auction" clause is a lawful means of ensuring quality mares are presented to Shareef Dancer, defendants' interference was not "without justification" or "coercive." As the District Court found, there was neither breach nor causation.

Lastly, we agree with the District Court that plaintiff has failed to present a genuine issue of material fact on the issue of damages. As we discussed in conjunction with the antitrust claim, plaintiff did not present any meaningful evidence that he could have obtained more than $100,000 but for the "no auction" clause.

### B

Plaintiff has likewise failed to establish the elements necessary to prevail on a claim of tortious interference with prospective advantage. The Court of Appeals of Kentucky considers the key factor to be "improper interference" with the relations. *Cullen v. South East Coal Co.*, 685 S.W.2d 187, 190 (Ky.App.1983), cited by the District Court. As we stated above, defendants did not *improperly* interfere, given their valid interest in controlling the quality of mares presented to Shareef Dancer. Also, plaintiff's failure to establish damages is equally dispositive as to prospective advantage.

For the above reasons, the District Court's grant of summary judgment in favor of defendants is AFFIRMED.