**HURON VALLEY HOSPITAL, INC. and Martin L. Trepel, D.O., Plaintiffs,**

v.

**CITY OF PONTIAC, a Michigan municipal corporation; City of Pontiac Hospital Building Authority, a Michigan municipal corporation; Pontiac Osteopathic Hospital, a Michigan nonprofit corporation; Crittenton Hospital, a Michigan nonprofit corporation; Sisters of Mercy Corporation, a Michigan nonprofit corporation; Comprehensive Health Planning Council of Southeastern Michigan, a health systems agency; North Oakland County Planning Steering Committee, a planning group under the auspices of Greater Detroit Area Health Council, Inc., a Michigan corporation; United States Department of Health and Human Services, an executive agency of the United States; Margaret Heckler, as Secretary of the Department of Health and Human Services; Bailus Walker, Jr.; Maurice S. Reizen, M.D.; Herman A. Ziel, M.D.; Richard Reihmer; Paul Massaron, and Terence E. Carroll, Defendants.**

No. 78–2970.

United States District Court,
E.D. Michigan, S.D.

Dec. 18, 1986.

U.S. Dept. of Health and Human Services and Margaret Heckler.

Long, Preston, Kinnaird & Avant by Grady Avant, Jr., Detroit, Mich., for defendants North Oakland County Planning Steering Committee and Greater Detroit Area Health Council, Inc.

Maxwell, Smith, Hanson and Mulvoy by Robert A. Maxwell, Bloomfield Hills, Mich., for defendants Sisters of Mercy Corp.

Riley and Roumell by Timothy M. Guerriero, Detroit, Mich., for defendants Comprehensive Health Planning Council of Southeastern Michigan, Paul Massaron and Terence E. Carroll.

Lesinski, Krall, Murphy & O'Neill by T. John Lesinski and Michael F. Murphy, St. Clair Shores, Mich., John P. Morris, Arizona State University College of Law, Tempe, Ariz., Cohen, Milstein & Hausfeld, P.C. by Jerry S. Cohen and Ann C. Yahner, Washington, D.C., and Russell & Dlugokinski, P.C. by Dennis J. Dlugokinski, Berkley, Mich., for plaintiffs.

Miller, Canfield, Paddock & Stone by Larry J. Saylor, Detroit, Mich., for defendants City of Pontiac and City of Pontiac Hosp. Building Authority.

Dykema, Gossett, Spencer, Goodnow & Trigg by Roger K. Timm, Detroit, Mich., for defendants Pontiac Osteopathic Hosp. and Crittenton Hosp.

Marvin L. Bromley and Edwin M. Bladen, Asst. Attys. Gen., Lansing, Mich., defendants Balius Walker, Jr., Maurice S. Reizen, M.D., Herman A. Ziel, M.C. and Richard Reihmer.

Charles Sorenson, Dept. of Justice, Civil Div., Washington, D.C., for defendants

## OPINION

GILMORE, District Judge.

This matter is again before the Court upon defendants' motions for summary judgment.[1] The defendants jointly moving the Court for summary judgment roughly fall into three categories. The first group is the hospital defendants, namely, Pontiac General Hospital (PGH), Pontiac Osteopathic Hospital (POH), Crittenton Hospital, and St. Joseph Mercy Hospital (SJMH). The second group is the organizational defendants, namely, Comprehensive Health Planning Council of Southeastern Michigan (CHPC–SEM), Greater Detroit Area Health Council, Inc. (GDAHC), and North Oakland County Planning Steering Committee (NOCPSC). The third group is the individual defendants, Paul Massaron and Terence Carroll.[2] Massaron is a former chairman of a CHPC–SEM committee. Carroll has been executive director of CHPC–SEM since 1971.

1. See this Court's prior opinions, *Huron Valley Hospital, Inc. v. City of Pontiac,* 585 F.Supp. 1159 (E.D.Mich.1984) and *Huron Valley Hospital, Inc. v. City of Pontiac,* 612 F.Supp. 654 (E.D.Mich.1985), affirmed 792 F.2d 563 (6th Cir.), *cert. denied* — U.S. —, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986).

2. Plaintiffs also name as defendants four officials of the Michigan Department of Public Health (MDPH). The state defendants are not before the Court on these motions for summary judgment.

## I. BACKGROUND

In its first amended complaint, plaintiff Huron Valley Hospital alleges it sustained injury redressable in federal court under three theories. Count I alleges all of the defendants conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff claims this conspiracy seriously hampered its efforts to enter and compete in the market for acute care hospital services in Oakland County.

Count II alleges violations of plaintiff's civil rights, specifically that plaintiff was deprived of property without due process of law in violation of 42 U.S.C. § 1983. Plaintiff relies on the same factual allegations in Count II as in Count I. Count II charges only the four hospital defendants, Massaron, Carroll, and the four state defendants.

In 1984, this Court disposed of Count III, a request for writ of mandamus, by directing the Secretary of Health and Human Services to reinstate plaintiff's Section 1122 approval. *Huron Valley Hospital, Inc. v. City of Pontiac,* 585 F.Supp. 1159 (E.D.Mich.1984). There was no appeal.

In addition to a summary judgment motion in which all defendants join, four individual motions were submitted by GDAHC and NOCPSC jointly, Massaron, Carroll, and CHPC–SEM. The Court finds it can decide the motions based on arguments made in the joint motion of all defendants, and therefore will address only those arguments.[3]

There are three dispositive issues. The first is whether plaintiff's evidence of conspiracy is sufficient to withstand a motion for summary judgment on Count I alleging violation of Section 1 of the Sherman Act. The second is whether summary judgment is appropriate because defendant's conduct is protected concerted activity under the *Noerr-Pennington* doctrine. The third is whether plaintiff's evidence of conspiracy is sufficient to withstand a motion for summary judgment on the element of state action necessary to support Count II alleging violation of 42 U.S.C. § 1983.

**3.** In addition, defendants have submitted several motions in limine to exclude evidence, but

## II. FACTS

With discovery now closed, the record in this case is voluminous, consisting of more than 50 depositions, more than 300 exhibits, and several affidavits. The question now presented is whether a reasonable jury, confronted with this mass of evidence, could find in favor of plaintiff. The dispute focuses on the permissible inferences from the facts set forth below.

As explained in this Court's prior opinion, 585 F.Supp. 1159 (1984), in order for plaintiff to build its hospital, it had to obtain a certificate of need (CON) from the State of Michigan, and capital expenditure approval from the Department of Health and Human Services (HHS) under Section 1122 of the Social Security Act, 42 U.S.C. § 1320a–1. The Section 1122 program, along with the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k *et seq.,* are major federal programs established to cut down unnecessary medical costs. Under this legislation, states, including Michigan, have established CON programs to insure that new hospital construction or expansion of existing facilities are not undertaken in areas where they are not needed. The Michigan Department of Public Health (MDPH) is the state agency that administers both the CON program and the Section 1122 program, pursuant to contract with HHS. Under both the federal and state schemes, MDPH is to obtain the nonbinding recommendation of the local health services agency on an application for CON and Section 1122 approval. In the case at bar, CHPC–SEM was the local health services agency.

The following is the timetable for plaintiff's procurement of Certificate of Need (CON) and Section 1122 approval.

| | |
|---|---|
| October 1976: | Joint CON and Section 1122 application filed with CHPC–SEM and MDPH |
| January 1977: | First amended application submitted pursuant to CHPC–SEM request for 5 year financial retrospectives |
| February 1977: | Second amended application submitted pursuant to CHPC–SEM request for additional materials |

the Court finds it is unnecessary to exclude the subject evidence to reach its decision.

| February 10, 1977: | CHPC–SEM considers plaintiff's application complete |
|---|---|
| February 14–17, 1977: | CHPC–SEM staff completes "staff analysis" of plaintiff's application and submits it to plaintiff and the CHPC–SEM Plan Implementation Committee (PIC). This analysis contains no recommendation. However, it addresses seven categories of CHPC–SEM Board adopted criteria and concludes with respect to five categories that "this project is not consistent with CHPC–SEM Board-adopted criteria." |
| February 23, 1977: | CHPC–SEM PIC, chaired by Massaron, with 20 of 27 members present, reviews plaintiff's application. PIC votes 14–1, Massaron abstaining, to recommend disapproval. |
| March 10, 1977: | Massaron presents PIC recommendation to CHPC–SEM Executive Committee. Executive Committee, with 17 of 24 members present, votes 9–1 (with Massaron abstaining) to recommend disapproval to MDPH. This recommendation is legally non-binding on MDPH. |
| March 14–July 5, 1977: | Contacts between plaintiff and MDPH, and between MDPH AND others. MDPH solicits additional information from Plaintiff. MDPH denies plaintiff's application. |

Although MDPH denied plaintiff's application, plaintiff ultimately obtained a CON and Section 1122 approval in April 1984.[4]

Harper Grace Hospitals acquired plaintiff in October 1984, after which plaintiff had sufficient financial backing to begin construction of its hospital. In March 1986, Huron Valley Hospital opened for business.

In contrast to plaintiff's timetable, Pontiac General Hospital (PGH) filed its CON and Section 1122 application on December 8, 1977, and received approval from MDPH on August 25, 1978.

The fate of PGH was up in the air at the time plaintiff entered the health care picture. In 1975, MDPH deemed PGH's facilities deficient, and required it to correct its shortcomings within three years or lose its license to operate. To do this, PGH had to apply for a CON. Ultimately, it was decided PGH would rebuild in Pontiac.

Coincidentally, Massaron, the CHPC–SEM PIC chairman, was also actively involved in the PGH controversy. On behalf of the UAW, Massaron publicly supported continued city ownership of PGH and rebuilding in the city.

The basic thrust of plaintiff's argument is that the defendants entered into a conspiracy to favor the continued existence of an established hospital, like PGH, at the expense of those, like plaintiff, who wanted to enter the health care market. The Michigan Court of Appeals held, in reviewing plaintiff's application for a CON, that reliance on criteria favoring existing facilities was unjustified because the MDPH had promulgated no rule to that effect under the Michigan Administrative Procedures Act. *Huron Valley Hospital v. State Health Facilities Commission,* 110 Mich. App. 236, 312 N.W.2d 422 (1981). Further, this Court in *Huron Valley Hospital v. City of Pontiac,* 612 F.Supp. 654, 660–61 (E.D.Mich.1985), found that alleged abuses of discretion and violations of statutory authority present in the administration of the CON statute could constitute violations of clearly established law, and, therefore, the state defendants were not entitled to immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This opinion was affirmed by the Sixth Circuit in *Huron Valley Hospital v. City of Pontiac,* 792 F.2d 563 (6th Cir.), *cert. denied* —— U.S. ——, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986).

A brief discussion of the functions of two of the defendants, Greater Detroit Area Health Council, Inc. (GDAHC), and North Oakland County Planning Steering Committee (NOCPSC), is necessary for a full understanding of the case.

GDAHC's existence dates back to 1944 when it formed as an independent hospital council designed to allocate charitable contributions among hospitals in the manner that made the most effective use of the charitable funds. After passage of the Hill-Burton Act in 1946 (42 U.S.C. §§ 291, *et seq.*), GDAHC expanded its purpose to include aiding in the establishment of a coordinated community-wide approach to meeting the community's health care needs in the field of hospital care. Among GDAHC's stated functions was to advise and assist hospitals in their relations to federal, state and local government.

GDAHC's membership includes representatives of civic, business and labor orga-

**4.** See this Court's opinion at 585 F.Supp. 1159 (1984) and *Huron Valley Hospital, Inc. v. State* *Health Facilities Commission,* 110 Mich.App. 236, 312 N.W.2d 422 (1981).

nizations in southeastern Michigan, insurance companies, and nearly all of the hospitals in southeastern Michigan. Defendants concede that GDAHC believed the most efficient and cost-effective provision of health care services to the southeastern Michigan community could be achieved by working with existing hospitals, rather than by encouraging the development of new hospitals. This was a reflection of the belief that not only the physical plant, but also the physicians, other medical personnel and administrative staff of these existing hospitals, constituted an important resource for the community.

NOCPSC is a sub-group formed by GDAHC in 1969 whose only members were and are the four hospital defendants. NOCPSC's birth was the direct result of the Partnership for Health Amendments of 1967, which mandate state comprehensive health plans to:

> provide for assisting each health care facility in the State to develop a program for capital expenditures for replacement, modernization, and expansion which is consistent with an overall State plan developed in accordance with criteria established by the Secretary after consultation with the State which will meet the needs of the State for health care facilities, equipment, and services without duplication and otherwise in the most efficient and economical manner, . . .

42 U.S.C. § 246(a)(2)(I)(i).

NOCPSC was one of numerous regional planning councils throughout southeastern Michigan sponsored by GDAHC. The purpose of these councils was to implement the goal of orderly planning through the sharing of information concerning future plans among hospitals located in the same State Plan sub-area.

Plaintiff claims that under the aegis of these legitimate organizations defendants developed and carried out an illegal plan to close the health care market in southeastern Michigan.

It is undisputed that in meetings of NOCPSC the hospital defendants shared information, made decisions, and reached agreements concerning the provision of health care services. Record support for this may be found in the depositions of Whitlow of POH, Zunker of Crittenton, Freysinger of PGH, and Schwartz of SJMH. Minutes of NOCPSC meetings also evidence this. In the minutes of the February 7, 1977 NOCPSC meeting, after the mention of plaintiff's upcoming February 23, 1977 CON review by CHPC–SEM, it is recorded that:

> . . . It was generally agreed that the Pontiac area hospitals have a great deal at stake in what happens to health care in the Western Oakland area.

> In view of this, the Committee agreed that a sub-committee of the Planning Steering Committee (NOCPSC) should be formed to cooperatively plan for ambulatory services in the Western Oakland Area. It was felt that as a start each hospital should detail where it is in the consideration of facilities in the area. This could be done through the sharing of the written plans, which would be discussed at the subcommittee meeting. Beyond this, the subcommittee will need to look at all the available information on the area. Finally, the sub-committee must review the alternatives available to deliver services to the area.

On February 6, 1978, the hospital defendants, under the aegis of NOCPSC, passed a joint resolution pledging cooperation in the planning for the provision of ambulatory health care services. In particular, the resolution recognized the current plans and commitments of POH and PGH "as major steps towards increasing the availability and accessability of ambulatory health care services to residents of the service area."

In 1974, the hospital defendants met with GDAHC to engage in joint planning for the provision of obstetrical services and other areas of service with the express objective of determining reasonable methods of consolidating obstetrical services in the area. MDPH had imposed a *requirement* of joint planning on the four hospital defendants in response to POH's proposal to provide obstetrical services, before MDPH would approve POH's CON in 1974.

GDAHC and CHPC–SEM have enjoyed frequent contact due to a prior working relationship from 1972–75 whereby GDAHC, under contract to CHPC–SEM, conducted the initial reviews of CON applications. In addition, both are located in the same building. From 1975 to 1977, contact relating to the CON review process continued in order to smooth the transition to CHPC–SEM's assuming complete responsibility for the review process. Further, GDAHC would relay its opinions on area hospitals' future plans to MDPH and CHPC–SEM as evidenced by letters concerning PGH from GDAHC to PGH, copies of which purportedly were sent to Carroll of CHPC–SEM and Reihmer of MDPH.

According to the affidavit of GDAHC member Verna Siller, GDAHC representative Holman told her that CHPC–SEM had "kicked back" Huron Valley's application for a Certificate of Need and that it would continue to kick back any further applications by Huron Valley.

Another piece of evidence plaintiff pinpoints as suggesting the existence of a conspiracy is a statement purportedly made by Parrott, a CHPC–SEM representative, that obtaining a CHPC–SEM recommendation of approval on a CON application was merely a "data game" and depended mainly on "twisting the proper arms on [the] Executive Committee." (Affidavit of Jay Eldridge).

Carroll of CHPC–SEM has also testified in deposition that he frequently communicated with MDPH officials, including attending MDPH meetings in Lansing and speaking with Reihmer on occasion two or three times a day.

Reihmer testified at his deposition that in his capacity as an MDPH official he often conversed with GDAHC and CHPC–SEM representatives and state legislators at the time plaintiff filed its notice of intent. There is evidence that Reihmer discussed PGH's anticipated CON application with a state senator, and that, in his conversations with PGH representatives, concern was expressed that MDPH could not approve both plaintiff's and PGH's applications for CONs.

Plaintiff offers as circumstantial evidence of a conspiracy the fact that, after the state court ordered MDPH to issue plaintiff's CON, which ultimately also brought forth Section 1122 approval, CHPC–SEM through Carroll, PGH, POH, and SJMH all requested HHS to reconsider its Section 1122 approval. The Secretary did reconsider its decision, and subsequently withdrew Section 1122 approval. There is evidence that Carroll communicated with the hospital defendants and others on the topic of these requests for reconsideration. On March 3, 1983 Carroll wrote to Richard Zunker of Crittenton, referring to HHS' February 24, 1983 issuance of Section 1122 approval:

Dear Dick,

The enclosed is [for your information]. I find the decision to be incredible and I do not intend to let the matter rest. I'll be in touch with you on this.

Terry

And, on April 25, 1983, Carroll wrote to Jack Whitlow of POH:

Dear Mr. Whitlow,

Reconsideration filed on behalf of St. Joseph Mercy Hospital (Pontiac) regarding the captioned project. [Huron Valley Hospital].

It is my understanding that several hospitals are presently preparing further Requests for for Reconsideration based on their own perspectives of the matter.

Sincerely,

/s/ Terence E. Carroll

Carroll wrote a similar letter to the Oakland County Board of Commissioners. In addition, there is evidence that CHPC–SEM and Carroll urged Federal legislators and officials to encourage HHS to appeal this Court's mandamus order directing the Secretary to reinstate its previously issued Section 1122 approval.

By his actions, Carroll made clear he opposed approval of plaintiff's CON application. These activities included several local newspaper articles in which Carroll was reported to have remarked negatively on the prospect of plaintiff's construction, letters from Carroll to the UAW, Chrysler

Corp., General Motors, Ford Motor Co., and Blue Cross/Blue Shield, urging them to file *amicus curiae* in the appeal of the Oakland County Circuit Court's ruling requiring MDPH to issue plaintiff's CON, and Carroll's opposition before Michigan's Water Resources Commission to its granting of a ground water discharge permit to plaintiff.

Defendants supply the Court with affidavits of four of the major actors in this saga. The contents of these affidavits are summarized as follows:

1.  Terence Carroll (Executive Director of CHPC–SEM) states that he did not vote on plaintiff's application, and that his actions opposing plaintiff were authorized by CHPC–SEM Board of Trustees and were "based solely upon the policy of CHPC–SEM that the requested beds were unneeded in the service area and because the CHPC–SEM Executive Committee had recommended denial of a certificate of need to Huron Valley Hospital." Mr. Carroll further states he never explicitly or implicitly reached a "meeting of the minds with any state official or employee of the [MDPH]" regarding plaintiff's application and never reached such an agreement with any of the defendants.

2.  Symond Gottlieb (Executive Director of GDAHC) describes GDAHC's evolution and character as follows:

    The board of directors and the membership of GDAHC were always composed of a majority of persons nominated by and representing groups other than hospitals. During the period 1956 through 1982, no more than ⅓ of the board of directors or the the executive committee could be hospital executives.

3.  Paul Massaron (former chairman of CHPC–SEM PIC) states that he quit the position and CHPC–SEM in December 1978; he did not vote on plaintiff's application; he had no economic or other personal interest in any other hospital including PGH; he never discussed plaintiff's application with state officials or MDPH employees, and he never conspired or agreed with state officials or MDPH employees regarding plaintiff's application.

4.  Richard Reihmer (a division chief of MDPH) states that beginning in 1974, his division and MDPH were instructed to review CON applications considering three policies: (1) no approval of new beds in areas overbedded according to the State Plan; (2) existing facilities seeking CONs to modernize would be preferred; and (3) "[CON] process would be utilized to remove existing beds from line only in the most extreme circumstances." MDPH enforced these policies prior to plaintiff's or PGH's applications and enforced them "without the influence of [GDAHC] or any of the four hospitals named as defendants in this case." Mr. Reihmer further states that his division's and MDPH's decision on plaintiff's application was unilateral and "*not* the result of or affected by any agreement or understanding with any of the non-MDPH defendants."

## III. EVIDENCE OF CONSPIRACY

### A. *Summary of Litigants' Arguments.*

Defendants' major argument is that, notwithstanding the evidence upon which plaintiff relies, a jury could not reasonably infer a conspiracy among defendants to exclude plaintiff from the relevant market.

Defendants argue that after massive discovery plaintiff is unable to present any direct evidence from which a jury could infer a conspiracy. They contend that all of the evidence is equally representative of cooperative efforts aimed at efficient health care planning, which is sanctioned, and even encouraged, under federal and state legislation.

The Court has reviewed the results of massive discovery, consisting of some 300 exhibits and 50 depositions, and finds that plaintiff has been unable to pinpoint any facts establishing that a conspiracy actually existed. Defendants point out that plaintiff Martin Trepel, who heads the Hu-

ron Valley Hospital operation, admitted he had no information that an agreement was reached among defendants. They further cite the testimony of Dr. J.J. Johnstone, who has been a member of plaintiff's Board since 1977:

Q. [A]re you aware of any evidence of the existence of a conspiracy?

A. Of any actual evidence?

Q. Yes.

A. Only innuendos.

.     .     .     .     .

Q. What innuendos did you hear or become aware of?

A. Well, we got a little paranoid when we were turned down for a certificate of need.

Finally, defendants point out that representatives of each defendant have denied the existence of an agreement or conspiracy designed to injure plaintiff or close the market for health services.

Plaintiff concedes that it has no direct evidence of conspiracy, but argues that the evidence and testimony that it has presented is such that a reasonable jury could infer existence of a conspiracy. At oral argument, counsel for plaintiff suggested that the Court consider the opportunities for collusion available to defendants, the defendants' plausible motive to exclude plaintiff, their continuing cooperative activity, and the fact that plaintiff had trouble procuring regulatory approval. Plaintiff's counsel argued that all this put together added up to a material issue of fact as to the existence of a conspiracy.

Citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), plaintiff points out that the lack of direct evidence of conspiracy is a common occurrence, as is the practice of inferring conspiracy from circumstantial evidence.

### B. *The Law*

The Supreme Court's most recent pronouncement on summary judgment motions in the antitrust context is *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In *Zenith,* American television manufacturers sued 21 Japanese corporations who manufactured and sold televisions, alleging a predatory pricing conspiracy. The *Zenith* plaintiffs' theory was that the defendants had conspired to sell at artifically high prices in Japan and to sell at artifically low prices in the U.S. in order to drive plaintiffs out of the American market. The defendants' pricing practices in Japan would subsidize their profit-losing practices in the U.S. In addition to evidence of a conspiracy to raise prices in Japan, the *Zenith* plaintiffs relied on evidence that defendants agreed to fix minimum prices in the U.S. market and that defendants agreed to limit to five the number of distributors in the U.S. market which each defendant could use.

In *Zenith,* the Third Circuit had referred to the above-referenced evidence as direct evidence of the alleged conspiracy and therefore had reversed the district court's grant of summary judgment for defendants. The Supreme Court reversed and remanded, stating:

On remand, the Court of Appeals is free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so. The evidence must "tend[ ] to exclude the possibility" that petitioners underpriced respondents to compete for business rather than to implement an economically senseless conspiracy. *Monsanto*, 465 U.S., at 764, [104 S.Ct. at 1470], ... In the absence of such evidence, there is no "genuine issue for trial" under Rule 56(e), and petitioners are entitled to have summary judgment reinstated.

*Zenith* —— U.S. at ——, 106 S.Ct. at 1362, 89 L.Ed.2d at 559.

The *Zenith* Court found the evidence upon which the Third Circuit had relied insufficient to raise a jury question because that evidence was ambiguous, and because there was an absence of motive for defendants to engage in the alleged predatory

pricing conspiracy. The evidence was ambiguous because it was as plausible that the conduct involved was undertaken for independent business reasons as that it was part of a conspiracy to undercut plaintiffs. Motive was lacking because predatory pricing conspiracies, to succeed, must continue for long periods of time during which the conspirators suffer lost profits, along with their victim, with the hope that ultimately it will pay off. The Court observed that, if the factual context makes the claim of conspiracy implausible, i.e. economic nonsense, then plaintiffs "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Zenith,* —— U.S. at ——, 106 S.Ct. at 1356, 89 L.Ed.2d at 552.

*Zenith* clearly applies beyond the context of predatory pricing allegations. Justice Powell wrote, "This case requires that we again consider the standard district courts must apply when deciding whether to grant summary judgment in an antitrust conspiracy case." *Zenith,* —— U.S. at ——, 106 S.Ct. at 1351, 89 L.Ed.2d at 546. The Court also noted that, even where there is a plausible motive to conspire, its prior decision in *Monsanto Co. v. Spray-Rite Service Corp., supra,* "establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Zenith* —— U.S. at —— n. 21, 106 S.Ct. at 1362 n. 21, 89 L.Ed.2d at 559, n. 21. More expansively, the Court stated:

> But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co.* ... we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.... See also [*First National Bank of Arizona v.*] *Cities Service* [, 391 U.S. 253, 88 S.Ct. 1757, 20 L.Ed.2d 569], ... To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. [*Monsanto,* 465 U.S., at 764,

104 S.Ct. at 1470.] Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. See *Cities Service* ...

*Id.,* —— U.S. at ——, 106 S.Ct. at 1357, 89 L.Ed.2d at 553 (citations omitted).

In *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court held that it was insufficient evidence of a conspiracy between a manufacturer and its distributors to fix prices, to show that defendant manufacturer had terminated its contract with the plaintiff, a former distributor, following the defendant manufacturer's receipt of complaints from other distributors of plaintiff's price-cutting practices. *Monsanto* held that circumstantial evidence consisting of plausibly legitimate, independent conduct by alleged co-conspirators is insufficient to create a jury question unless there is more evidence of conspiracy to supplement it and to exclude the possibility of independent conduct.

In *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Court affirmed the award of summary judgment for the anti-trust defendant because plaintiff's circumstantial evidence of defendant's involvement in the alleged conspiracy was ambiguous. There, plaintiff's evidence was defendant's refusal to buy Iranian oil from plaintiff, although plaintiff's offer was highly competitive. However, in light of evidence that others in the oil market had agreed to retaliate against those who bought Iranian oil, the Supreme Court held the plaintiff had failed to establish a material issue of fact that the alleged conspiracy existed. *Id.* at 280, 88 S.Ct. at 1588. The Court found that, considering defendant's evidence, its failure to deal resulted from non-conspiratorial motives, and there was no question for the jury on the issue of conspiracy.

The Supreme Court has consistently cautioned courts to be careful in granting sum-

mary judgment in antitrust cases, *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Cities Service, supra; Zenith, supra.* But in *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), where the public figure libel plaintiff argued summary judgment should not readily be granted where intent and state of mind are at issue, the Court clarified its warning.

> We do not understand *Poller,* however, to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment in a conspiracy or libel case, for example, without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Based on that Rule, *Cities Service,* ... held that the plaintiff could not defeat the properly supported summary judgment motion of a defendant charged with a conspiracy without offering "any significant probative evidence tending to support the complaint." As we have recently said, "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion." ... *Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.* We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence

from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.

*Id.,* —— U.S. at —— – ——, 106 S.Ct. at 2513–14 at 216–17 (citations omitted) (emphasis added).

The Sixth Circuit has stated the applicable standard for summary judgment in an antitrust case in *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942 (6th Cir. 1983). *Smith* acknowledges that the Supreme Court has cautioned hesitancy in granting summary judgment for antitrust defendants and has encouraged leniency in the court's examination of the antitrust plaintiff's evidence. However, the court also expressed an approach consistent with *Zenith,* saying:

> The lesson learned from *Poller* and [*Cities Service*] is that, although the court should treat antitrust plaintiffs leniently in examining their proofs for issues of fact on a summary judgment motion, those proofs must nonetheless provide some factual basis upon which the conspiracy and intent elements may be reasonably inferred. Once the defendant has adequately rebutted the plaintiff's allegations by establishing legitimate alternative explanations for its conduct which disprove the inferences the plaintiffs seek to draw, then the plaintiffs must come forward with some "significant probative evidence tending to support the complaint."

*Id.* at 948. (footnotes and citations omitted). *See also Potters Medical Center v. City Hospital Assoc.,* 800 F.2d 568 (6th Cir.1986).

The mass of legislation regulating the health care industry cannot be summarized in capsule form. However, a few salient points should be highlighted. In the field of health care planning, Congress has made clear that such planning requires active cooperation and joint activity among health care providers. The Comprehensive Health Planning and Public Health Services Amendments, 42 U.S.C. § 201 *et seq.,* providing federal grants to states with con-

forming comprehensive health plans, include the following provision:

> In order to be approved for purposes of this subsection, a State plan for comprehensive State health planning must— ... *provide for encouraging cooperative efforts among governmental or nongovernmental agencies, organizations and groups concerned with health services, facilities, or manpower,* and for cooperative efforts between such agencies, organizations, and groups and similar agencies, organizations, and groups in the fields of education, welfare, and rehabilitation; ...

42 U.S.C. § 246(a)(2)(D) (Supp.1986) (emphasis added).

In the preamble to the National Health Planning and Resources Development Act (NHPRDA) of 1974, Congress made the following finding:

> Since the health care provider is one of the most important participants in any health care delivery system, health policy must address the legitimate needs and concerns of the provider if it is to achieve meaningful results; and, thus, it is imperative that the provider be encouraged to play an active role in developing health policy at all levels.

42 U.S.C. § 300k(a)(5) (Supp.1986).

Also under the NHPRDA, the "primary responsibility" of each health service agency is "effective health planning for its health service area and the promotion of the development within the area of health services, manpower, and facilities which meet identified needs, reduce documented inefficiencies, and implement the health plans of the agency." 42 U.S.C. 300*l*–2(a). CHPC–SEM is the health service agency for Service Area 76, which is the area concerned in this litigation.

The NHPRDA lists as one function of a health service agency "preventing unnecessary duplication of health resources." 42 U.S.C. § 300*l*–2(a)(4). Further, under Section 300*l*–2(c)(1), the health service agency is to "seek, to the extent practicable, to implement [its plans, formulated pursuant to other sections of the Act] with the assistance of individuals and public and private entities in its health service area."

Amendments in 1979 to NHPRDA were aimed at ensuring that competition in the health care market would continue, notwithstanding statutorily authorized cooperation. However, in the context of inpatient health services, the NHPRDA continued to express Congress' view that "competition does not or will not appropriately allocate supply" and therefore "health systems agencies ... should ... take actions ... to allocate the supply of such services." 42 U.S.C. § 300k–2(b)(2). This contrasts with Section 300k–2(b)(3), applicable to health services other than inpatient that directs agencies to "give priority ... to actions which would strengthen the effect of competition on the supply of such services." *See also National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City,* 452 U.S. 378, 383–88, 101 S.Ct. 2415, 2419–21, 69 L.Ed.2d 89 (1981); *Hospital Building Co. v. Trustees of Rex Hospital,* 691 F.2d 678, 684–85 (4th Cir. 1982), *cert. denied* 464 U.S. 890, 104 S.Ct. 231, 78 L.Ed.2d 224 (1983).

Also relevant to this litigation is the body of state regulation of the health care industry. In particular, two points should be noted. First, the 1975–76 Michigan State Plan projected a situation of overbedding for Service Area 76. It was estimated that, even without plaintiff's facility, the area would have around 150 excess beds. Second, in 1978, the Michigan legislature enacted new CON law. The prior CON law is concededly relevant to the procedures in this case. However, one aspect of the new law was to establish an excess hospital capacity reduction program. M.C.L.A. §§ 333.22154, 333.22156. This required MDPH to devise a list of significantly overbedded areas (25 or more beds in excess of need). Until an area on the list prepared a plan for reduction of its excess, the statute prohibited MDPH from issuing a CON to any hospital applying in that area. M.C. L.A. § 333.22156.

### C. Conclusion

After exhaustive discovery, plaintiffs most persuasive evidence—all circumstantial—of the antitrust conspiracy it alleges is:

1. The explicit cooperation among hospital defendants under the aegis of NOCPSC, manifested in joint resolutions of further cooperation and for the provision of ambulatory health care services, and agreements in 1978 to voluntarily reduce the number of hospital beds in each hospital defendant's facility.

2. The exercise of a clear preference for existing facilities in the evaluation by MDPH of plaintiff's application for a certificate of need that appears to have resulted in denying plaintiff's CON in favor of Pontiac General Hospital's expected application.

3. Procedural improprieties in the administration of the CON law, which ultimately led the Michigan courts to order issuance of a CON to plaintiff.

4. CHPC–SEM director Carroll's energetic activities.

5. Siller's affidavit to the effect that GDAHC director Holman had told her CHPC–SEM would continue to kick back plaintiff's application.

6. Eldridge's affidavit to the effect that CHPC–SEM representative Parrot said that obtaining a recommendation of approval from CHPC–SEM was merely a "data game" and depended mainly on "twisting the proper arms on the Executive Committee."

To a large extent, plaintiffs base their argument that a jury could infer an illegal conspiracy on the existence and activities of defendants GDAHC and NOCPSC. The Court may assume these entities created a chilly environment in the health care market for hopeful new entrants such as plaintiff. However, this Court finds the existence and activities of GDAHC and NOCPSC not only legal, but encouraged under health planning legislation.

As indicated earlier, GDAHC is an education-oriented private organization originally formed in 1944. In 1946, Congress enacted the Hill-Burton Program that was designed to promote more efficient provision of health care services. Thereafter, a major function of GDAHC was to advise and assist local hospitals in furtherance of the goals of the Hill-Burton Act. Although it is not entirely clear from the briefs, it appears that until the adoption of the NHPRDA in 1974, GDAHC, as a local health planning council, was eligible for federal funding under the Comprehensive Health Planning and Public Health Services Amendments of 1966, specifically under 42 U.S.C. § 246(b). In response to the same statute, specifically the Partnership for Health Amendments of 1967, GDAHC sponsored the formation of NOCPSC and other regional planning councils in Southeastern Michigan to implement the goals of orderly planning, elimination of duplicative and overlapping health services, and efficient provision of health care services.

While provisions for Federal funding were allowed to lapse with the adoption of the NHPRDA in 1974, the underlying statutory provisions remain in effect. For example, 42 U.S.C. § 246(a)(2)(I)(i) mandates state comprehensive health plans to assist health care providers in developing programs that will advance the state plan to "meet the needs of the state for health care facilities, equipment and services without duplication and otherwise in the most efficient and economical manner ..." See also 42 U.S.C. § 246(a)(2)(D), *supra;* 42 U.S.C. § 300k(a)(5), *supra;* 42 U.S.C. § 300 *l*-2(c)(1), *supra.* Finally, as mentioned above, Congress, in Section 300k–2(b)(2), recognized that, as concerns inpatient health services, "competition does not or will not appropriately allocate supply" and therefore "health systems agencies ... should ... take actions ... to allocate the supply of such services."

The legislation regulating the health care industry does not explicitly require the existence of GDAHC and NOCPSC. However, the health care planning that the statutes envision would be impossible or ineffective without meetings among health care providers for the sharing of information and cooperation in plans for providing

health care services. *See Hospital Building Corp. v. Trustees of Rex Hospital, supra.*

■ In the case at bar, it is clear that the defendants, particularly the hospitals, were cooperating among themselves, were engaging in joint activity and were not acting independently in the strict sense. However, there is no significant evidence that the joint planning activity undertaken was other than pursuant to the statutory scheme calling for such cooperation in the health care field. Allowing plaintiff to go to trial without more than this circumstantial evidence of legitimate cooperation among defendants may impede the operation of legislation designed to promote efficient and economical provision of health care services. As in *Zenith,* this case calls for hesitancy in allowing a potentially mistaken inference of conspiracy. The *Zenith* court, dealing with an alleged predatory pricing conspiracy, noted that cutting prices "often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly because they chill the very conduct the antitrust laws are designed to protect." *Zenith,* —— U.S. at ——, 106 S.Ct. at 1360, 89 L.Ed.2d at 557. Similarly, here, allowing the case to go to the jury without more direct evidence of conspiracy may have a chilling effect on the very conduct health-planning legislation encourages.

Specifically, the agreement among hospital defendants voluntarily to reduce excess beds, while evidence of cooperation, can hardly be treated as circumstantial evidence of a conspiracy to exclude plaintiff from the market. This is because, under Michigan's CON law effective in 1978, unless reduction of excess beds occurred, there would have been a moratorium on the approval of CONs for the relevant service area. In other words, as defendants pointed out at oral argument, each hospital had a reason independent of plaintiff's entry into the market for agreeing to reduce its number of beds. Unless such a reduction took place, each hospital would be unable to gain approval of future applications for CONs it might file.

■ Plaintiff's evidence that MDPH, in reviewing plaintiff's application for CON, entertained a preference for existing facilities and committed procedural improprieties may reflect poor administration of Michigan's CON law. However, according to the affidavit of Richard Reihmer of MDPH, the preference for existing facilities was a criterion MDPH had been instructed to apply beginning in 1974. Further, Reihmer states that MDPH enforced these policies prior to plaintiff's or PGH's applications without any influence from GDAHC or the hospital defendants. The Court finds the mere existence of the preference and apparent administrative bungling in the processing of plaintiff's application would not justify a jury in inferring the existence of a conspiracy.

■ As for Carroll's activities, while perhaps he was on some sort of vendetta, evidence is lacking that it was any more than personal or on behalf of CHPC–SEM after that organization had arrived at an official stance on plaintiff's application. Plaintiff asserts that Carroll orchestrated opposition to plaintiff, but the evidence shows only that he performed all activities publicly. Carroll let all entities involved know what he was doing on behalf of CHPC–SEM with regard to plaintiff's application. The Court feels a reasonable jury could not conclude, from the evidence of one man's actions and statements directed against plaintiff, that there existed a conspiracy among up to 14 defendants to exclude plaintiff from the health care market.

Finally, the statements made according to the affidavits of Sillers and Eldridge, while far from admirable, may well reflect nothing more than off-hand statements. In any case, these two isolated statements hardly justify concluding there is a material issue of fact as to the existence of a conspiracy of the proportions plaintiff alleges.

In other contexts, the amount of cooperation and joint activity among defendants in this record might justify sending the case to the jury. However, in the context of health care regulation, plaintiff is obliged

to come forward with more than circumstantial evidence of cooperation among defendants in order to create a material question of fact for the jury. This it has not done. The evidence upon which plaintiff relies is too ambiguous to permit a jury to find defendants engaged in an antitrust conspiracy rather than in the joint planning activity envisioned in federal and state health care legislation.

It is therefore clear that the extensive evidence developed at deposition and in discovery is not sufficient to justify putting this case to the jury against the defendants who are movants here. These defendants' joint activity does not create a factual antitrust jury issue because the activity was cooperation equally suggestive of compliance with legislation encouraging joint planning in the health field as with antitrust conspiracy. Nor can these defendants be held liable for MDPH's procedural improprieties evidenced in the processing of plaintiff's CON application. The state defendants and the MDPH are not participants in this motion, and their activities are not subjects of consideration here.

It therefore appears clear that defendants are entitled to summary judgment on the antitrust claim. The Court will, however, consider defendants' claim under *Noerr-Pennington*, even though decision under *Noerr-Pennington* is not necessary to a disposition of the antitrust claim.

## IV. NOERR PENNINGTON ANTITRUST IMMUNITY

■ As alternative support for their motion for summary judgment, defendants claim entitlement to antitrust immunity under the *Noerr-Pennington* doctrine, which holds that joint efforts to influence public officials do not violate the antitrust laws, even though intended to eliminate competition. The doctrine is intended to preserve the First Amendment right to petition the government. It is set forth in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport*

*Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

In this Court's prior opinion in *Huron Valley Hospital v. City of Pontiac*, 612 F.Supp. 654 (E.D.Mich.1985), it dealt with a motion for immunity under *Noerr-Pennington* made by these defendants. The Court held:

> [A]n exception to this doctrine has been created where the attempt to influence government is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." ... The allegations in this case go beyond the mere filing of one lawsuit, which the Sixth Circuit recently found protected under the *Noerr-Pennington* doctrine in *City of Cleveland v. Cleveland Electric*, 734 F.2d 1157 (6th Cir. 1984), but are more analogous to the sort of abuse of process in barring access to agencies or courts that the court stated would fall within the sham exception.
>
> The Second Circuit held in *Litton Systems, Inc. v. AT & T*, 700 F.2d 785, 809 n. 36 (2d Cir.1983) that the sham exception to the *Noerr-Pennington* doctrine is applicable in the situation known as "agency capture," where the regulated become the regulators. This is precisely the situation *alleged in the complaint in this action*, and *taking the allegations as true for the purpose of this motion*, as the Court must, the Court finds that *Noerr-Pennington* does not apply to these defendants, and does not provide a basis for dismissal.

*Id.* 663–64 (emphasis added).

That determination was based on the pleadings and not on a thoroughly developed record, which the Court has now.

Defendants recognize that plaintiff's complaint boils down to allegations of a conspiracy to deny plaintiff meaningful access to the health care regulatory process. Defendants concede that, were that the case here, *Noerr-Pennington* immunity could not be claimed. Defendants contend, however, that plaintiff has failed to come forward with evidence from which a rea-

sonable jury could infer that defendants' actions corrupted the regulatory processes. Plaintiff, on the other hand, argues that defendants' activity constituted a sham undeserving of *Noerr-Pennington* immunity from antitrust liability. Plaintiff also argues that defendants requested HHS's reconsideration of Section 1122 approval solely to delay the Huron Valley Hospital project, that government officials participated in the conspiracy to delay or prevent Huron Valley from entering the market, and that the established preference for preserving existing hospitals effectively denied plaintiff meaningful access to the regulatory process. Plaintiff contends that all such activities constituted a sham rather than legitimate efforts to influence the government protected under the *Noerr-Pennington* doctrine.

In *Noerr,* the Court found there could be no antitrust liability where the plaintiffs, a group of truckers, claimed defendants, a group of railroad companies, conspired to engage in a joint publicity campaign designed to encourage promulgation of laws and law enforcement practices detrimental to the truckers and their business. The Court held that Congress did not intend the Sherman Act to operate as a restriction on political activity, and even if it were intended to restrict such activity, it would infringe on antitrust defendants' First Amendment rights.

In *Pennington,* the Court extended the *Noerr* holding to concerted activity aimed at influencing executive agencies. There the Court found there could be no antitrust liability where the plaintiff, a coal mining company, alleged the union and several large coal operators had committed antitrust violations by acting in combination to persuade the Secretary to Labor to enforce a minimum wage regulation in such a way as to adversely affect plaintiff, potentially eliminating it from competition.

The Court extended the *Noerr-Pennington* doctrine to joint efforts to petition state and federal courts in *California Motor Transport Co. v. Trucking Unlimited, supra,* and established the "sham" and "co-conspirator" exceptions. The Court stated the *Noerr-Pennington* defense is inapplicable:

> where the alleged conspiracy "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified."

*Id.,* 404 U.S. at 511, 92 S.Ct. at 612.

The *Noerr-Pennington* doctrine rests on two grounds: The First Amendment's protection of the right to petition the government, and the recognition that a representative democracy depends upon the ability of people to make known their views and wishes to the government. The sham exception arises only when the alleged conspiracy is a mere sham to cover an attempt to interfere directly with the business relations of a competitor, and not to properly petition the government or administrative agencies for relief.

The Sixth Circuit has recently dealt with *Noerr-Pennington* immunity in two cases, *Westmac, Inc. v. Smith,* 797 F.2d 313 (6th Cir.1986), and *Potters Medical Center v. City Hospital Association,* 800 F.2d 568 (6th Cir.1986).

In *Westmac,* the Sixth Circuit affirmed the district court's grant of summary judgment to defendants based on the defendants' claimed immunity under *Noerr-Pennington.* Plaintiff sued defendants, charging antitrust violations. The focus of the case concerned defendants' opposition to plaintiff's effort to obtain special tax benefit bond financing of a grain elevator. Plaintiff charged defendants with pursuing and conducting lobbying and litigation activities for the express purpose of forcing plaintiff to joint an anticompetitive price maintenance conspiracy, or, if that failed, to damage plaintiff economically by reducing or destroying its ability to compete. The Court of Appeals affirmed the district court's holding that no genuine issue of material fact existed respecting whether defendants' lobbying and litigation activities were genuine attempts to influence the official decision making protected by the *Noerr-Pennington* doctrine.

The *Westmac* court held that the sham exception is a narrow one applicable only when the activity corrupts governmental processes to such an extent that it constitutes access barring conduct of the sort described in *California Motor:*

> We also agree with the rationale of *Razorback* [*Ready Mix Concrete Co. v. Weaver,* 761 F.2d 484] that the sham exception is a "narrow one" and "is applicable when the activity in question corrupts governmental processes to such an extent that it constitutes access barring conduct of the sort described in *California Motor.* ... We further agree with that court's reasoning that "the key to the 'sham exception' is an improper interference with governmental process."

> .     .     .     .     .

> We hold that when a lawsuit raises a legal issue of genuine substance, it raises a rebuttable presumption that it is a serious attempt to obtain a judgment on the merits instead of a mere sham or harassment. The first amendment interests concerned and the case law discussed earlier support placing the evidentiary burden on the antitrust plaintiff to prove that the action of the defendant comes within the sham exception to *Noerr-Pennington* in this kind of case.

*Id.* at 318.

In *Potters Medical Center,* the court held that that the defendant hospital was insulated from antitrust liability under the *Noerr-Pennington* doctrine. The defendant hospital had opposed its competitor's Section 1122 application, and had participated in litigation challenging the competitor's affiliate's acquisition of equipment and commencement of a building program without obtaining a certificate of need. The court held that the Hospital's activities were precisely the type of conduct intended to be insulated by *Noerr-Pennington,* and not within the sham exception. It also held that, on that issue, summary judgment was allowable. The court said:

> On these undisputed facts, City Hospital's conduct did not rise to "a pattern of baseless, repetitive claims" or "abuse of processes" necessary to constitute sham

activity, *California Motor Transport,* 404 U.S. at 513 [, 92 S.Ct. at 613], or even create an inference of such. City Hospital was exercising its First Amendment right to petition the government; even if its conduct was accompanied by an "overall intent" that was "anti-competitive" and "hostile" as charged in Potters' brief, such advocacy was precisely the type of conduct protected by the *Noerr-Pennington* doctrine. " ... [I]nsofar as [its] campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Noerr,* ...

*Id.* at 579.

And, as pointed out in *Potters Medical Center,* quoting from *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1156 (7th Cir.), *cert. denied* 464 U.S. 891, 104 S.Ct. at 234, 78 L.Ed.2d 226 (1983).

> Without a doubt, the intention to harm a competitor is *not* sufficient to make litigation or administrative proceedings a sham. That competitive motive is the very matter protected under *Noerr-Pennington.* Rather, the requisite motive for the sham exception is the intent to harm one's competitors not by the result of the litigation but by the simple fact of the institution of litigation.

*Potters Medical Center,* at 1162 (emphasis in original).

It is plaintiff's basic contention that the defendants conspired to use the regulatory process to further their goal of excluding plaintiff from the health care market. Defendants respond by pointing out that the use of the regulatory process constituted activity protected from antitrust liability under *Noerr-Pennington.* The plaintiff, in rebuttal, claims the defendants' action was a sham, and, therefore, they are entitled to no *Noerr-Pennington* protection. There is no question that, when plaintiff's CON application was pending, there were numerous contacts between MDPH officials, CHPC–SEM officials, GDAHC officials, and representatives of the four hospital

defendants, and there is no question but that the various hospital defendants and GDAHC strongly urged CHPC–SEM to recommend denial of plaintiff's application to MDPH. The Court can further assume that defendants agreed among themselves to engage in such lobbying with hopes that they would prevent the plaintiff from joining them in the market for health care services.

However, such activity would be clearly protected under *Noerr-Pennington*. *Potters Medical Center* makes clear that a health care provider's expression to a local health services agency of its opposition to the regulatory approval of a potential competitor's application cannot form the basis for antitrust liability. Furthermore, it is clear that the *Noerr-Pennington* doctrine protects the petitioning to MDPH, the agency vested with the authority to make a binding decision on plaintiff's application. These cases shield from the Sherman Act a concerted activity to influence public officials, and joint efforts to influence public officials do not violate the antitrust laws, even though intended to eliminate competition. The only exception to this rule is the sham exception, and it is clear here that the sham exception does not apply.

It is further claimed by the plaintiff that the various defendants' requests to the Secretary of Health & Human Services to reconsider the approval of plaintiff's Section 1122 application constituted sham activity undertaken solely to delay plaintiff's project. However, the Court finds that after extensive discovery plaintiff has failed to come forward with any evidence that would create a material issue of fact as to the bona fides of defendants' actions. Furthermore, the Court finds that plaintiff has failed to produce evidence rebutting the *Westmac* presumption.

Finally, plaintiff contends that, by their conduct, defendants succeeded in denying plaintiff meaningful access to the regulatory process. Perhaps the most serious allegation is that MDPH officials were part of a conspiracy to prevent plaintiff's entry into the market. Because of this alleged official involvement in the conspiracy, plaintiff argues defendants cannot claim

*Noerr-Pennington* immunity. Similarly, plaintiff argues the preference for existing facilities and the presence of Massaron, a PGH advocate, on a CHPC–SEM Committee considering plaintiff's application made it impossible for plaintiff to pursue regulatory approval with any hope of success.

The concept that *Noerr-Pennington* immunity is inapplicable to activities intended to bar one's competitor from meaningful access to legal process originated in *Trucking Unlimited, supra.* It was in that case, too, that the Court suggested that a conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression. This developed into the so-called coconspirator exception to *Noerr-Pennington* immunity. Clearly, however, the rationale behind that exception is that the involvement of a public official in the conspiracy against an antitrust plaintiff almost necessarily prevents the victim from availing itself of normal procedures to enter the market. *See Garst v. Stoco, Inc.* 604 F.Supp. 326, 332 (E.D. Ark.1985).

The flaw in plaintiff's reliance on the coconspirator exception in this Court's view is that the plaintiff has failed to produce any evidence creating a material issue of fact as to whether MDPH officials conspired with any of the defendants now before this Court. Plaintiff makes much of the fact that MDPH followed CHPC–SEM's recommendation that plaintiff's CON application be denied. But defendants have supplied the Court with the sworn testimony of MDPH officials that MDPH's decision on plaintiff's application was not the result of an agreement or conspiracy between MDPH and the defendants.

■ This Court cannot agree with plaintiff that the preference for existing facilities denied plaintiff meaningful access to the regulatory process, and therefore dissolves defendants' immunity under the *Noerr-Pennington* doctrine. While the preference obviously operated to plaintiff's detriment, there is no evidence it was the result of activity by the moving defendants

that barred plaintiff's access by corrupting the governmental processes.

Finally, the Court is unable to see how the presence of Massaron on CHPC–SEM committees considering plaintiff's application could have barred plaintiff from meaningful access to the regulatory process. Massaron was a UAW representative who advocated, on behalf of the UAW, a certain position concerning PGH. The Court notes that by law the composition of CHPC–SEM's governing body and subcommittees had to consist of at least 40 per cent health care provider representatives. 42 U.S.C. § 300*l*–1(b)(3)(C). Since the statutory scheme envisions the presence of persons with vested interests in specific institutions, this Court cannot see how Massaron's presence, even assuming he strongly supported PGH, denied plaintiff meaningful access to the entire regulatory process. Furthermore, the evidence shows that Massaron abstained in the votes of the two CHPC–SEM committees that resulted in CHPC–SEM's recommendation to MDPH that plaintiff's CON application be denied.

## V. PLAINTIFF'S CLAIM UNDER 42 U.S.C. § 1983

Count II of plaintiff's complaint charges the four hospital defendants, Massaron, Carroll, and the four state defendants with violating 42 U.S.C. § 1983.[5] All of these defendants, except the state defendants, now move for summary judgment.

In *Huron Valley Hospital v. City of Pontiac*, 612 F.Supp. 654, this Court dealt with a prior motion under Section 1983, and held upon the allegations made in the pleadings that the motion should be denied under *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *Adickes* held that "private persons jointly engaged with state officials in the prohibited action, are acting 'under color' of state law for purposes of the Statute.... It is enough that [the accused] is a wilful partic-

ipant in joint activity with the state and its agents."

Since the rendering of that opinion, there has been extensive discovery. The facts developed by this extensive discovery now establish that summary judgment should be granted on the Section 1983 count in favor of the moving defendants.

To prevail in a Section 1983 suit, the plaintiff must establish the defendant acted under color of state law. The parties before this Court agree that, because only the private defendants are moving for summary judgment, to show "state action" plaintiff must establish that there was a conspiracy between the private defendants and state officials to deprive plaintiff of its rights under the United States Constitution.

Many of the facts relevant to the antitrust count are relevant to this count. However, here, the focus must be on evidence of conspiracy between the private defendants and the state officials. For the purposes of this motion, the state official whose actions are most seriously implicated are those of Richard Reihmer.

It is clear that, from March to July 1977, before the denial of plaintiff's application for a CON, MDPH officials discussed with representatives of the hospitals in the relevant service areas the impact of plaintiff's application on existing facilities. Also, it is evident that Reihmer, of MDPH, often conversed with representatives of CHPC–SEM at the time plaintiff's application was pending.

It is also true that Michigan courts have found that, in evaluating and processing plaintiff's application, MDPH illegally relied upon unpromulgated criteria favoring existing facilities. There is also evidence that Carroll frequently communicated with MDPH officials and attended MDPH meetings in Lansing in his capacity as director

---

**5.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other per-

son within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

of CHPC–SEM. Finally, plaintiff points out that a new planning analyst at MDPH, with relatively little experience, was charged with reviewing plaintiff's application, and that the final decision of MDPH denying plaintiff's application contains significant verbatim excerpts from the CHPC–SEM staff analysis that had recommended against granting a CON to plaintiff.

By affidavit, Carroll and Massaron have explicitly denied the existence of any agreement or conspiracy between them and state officials regarding plaintiff's applications. Representatives of each of the hospital defendants have likewise denied the existence of a conspiracy. Finally, by affidavit, Reihmer has asserted that his and MDPH's decision on plaintiff's application was unilateral, and not the result of any kind of an agreement with any of the private defendants.

Authority for the proposition that a civil rights plaintiff may demonstrate state action through proof of a conspiracy between private and state actors is found in *Adickes v. S.H. Kress & Co.*, supra.[6]

*Adickes* involved the arrest of a white school teacher who was refused service in respondent's lunchroom when she was accompanied by six black students. She was arrested for vagrancy by the Harrisburg, Mississippi police when she left the premises. The Supreme Court found sufficient evidence of state action to create an issue of fact, and ruled that private persons jointly engaged with state officials are acting under color of state law for the purposes of 42 U.S.C. § 1983.

But *Adickes* makes clear that the plaintiff must show not only joint activity but joint activity directed against the plaintiff. The Court said:

> Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if

she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store, or to cause her subsequent arrest because she was a white person in the company of Negroes. *Id.* at 152, 90 S.Ct. at 1605.

■ While it is not necessary for the plaintiff to prove that each participant in a conspiracy knew the exact parameters of the plan, it must be demonstrated that the private defendants and the the government officials at least shared the general conspiratorial objective. In *Fonda v. Gray*, 707 F.2d 435 (9th Cir.1983), plaintiff sued the government and two banks alleging a conspiracy to suppress her out-spoken political views. The district court granted summary judgment, and the court of appeals affirmed, holding that mere acquiescence of bank employees to the request of the Federal Bureau of Investigation to view plaintiff's bank account was insufficient under Section 1983 to prove conspiracy between the banks and the government to deprive plaintiff of her constitutional rights. The court said:

> To prove a conspiracy between private parties and the government under § 1983, an agreement or "meeting of the minds" to violate constitutional rights must be shown.... The mere acquiescence of the bank employees to the investigation request of the FBI to view Fonda's bank records is, without more, insufficient to prove a conspiracy. While it is not necessary to prove that each participant in a conspiracy know the exact parameters of the plan, they must at least share the general conspiratorial objective.... The FBI investigation may have been part of a bad faith effort to curb Fonda's antiestablishment conduct, but this, without more, will not suffice to make the banks liable. The argument that the banks had a duty to learn of the allegedly unlawful objectives of the FBI

---

**6.** *See also United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966) where the Court said: "To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." (footnote omitted).

investigation is without merit. While a breach of the duty a bank owes to its depositor may give rise to contractual or tort liability, it surely is not, in and of itself, sufficient to prove the banks intended to join or to further the broad conspiratorial objective of curbing Fonda's political speech.

*Id.* at 438.

And, in *Tarkowski v. Robert Bartlett Realty Co.,* 644 F.2d 1204, 1206 (7th Cir. 1980), the court, discussing the *Adickes* concept of conspiracy for the purpose of Section 1983 state action, said, "It is not sufficient to allege that the [private and state] defendants merely acted in concert or with a common goal. There must be allegations that the defendants had directed themselves towards an unconstitutional action by virtue of a mutual understanding."

It is therefore apparent that, with exhaustive discovery complete, plaintiff's evidence is not sufficient to justify a jury in finding a conspiracy between the private defendants and the state actors to violate plaintiff's civil rights. There may be no Section 1983 action in a case like this unless such conspiracy can be found because only then may it be said that "The alleged infringement of federal rights [is] 'fairly attributable to the state'", *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982).[7]

■ Plaintiff has repeatedly alleged that state officials and the private defendants agreed to grant PGH its CON and to deny plaintiff's application. Plaintiff has buttressed these allegations with evidence of interaction among the actors. But interaction is anticipated in state and federal health planning legislation. The evidence

plaintiff presents is insufficient to allow a jury to conclude there existed a conspiracy to keep the plaintiff out of the market by unconstitutional means, in violation of 42 U.S.C. § 1983.

Under 1972 P.A. 256, M.C.L.A. § 331.-456(b), the Michigan Certificate of Need Law, MDPH was directed to seek the recommendation of CHPC–SEM on plaintiff's CON application. Further, under NHPRDA and Section 1122, CHPC–SEM, as the local health services agency, was required to submit a recommendation to MDPH with regard to each health facility capital expenditure within its jurisdiction that was subject to CON or Section 1122 review. 42 U.S.C. §§ 300*l*–2(f), 1320a–1(b)(1). It is abundantly clear that NHPRDA envisions active cooperation and interaction among the regulators and the regulated towards a goal of efficient and economical provision of health care services. Such cooperation and interaction does not provide the state action necessary to support a lawsuit under Section 1983.

The Supreme Court allowed plaintiff to go to the jury in *Adickes, supra,* with relatively sketchy evidence of conspiracy between state and private actors. That case addressed racial discrimination in the South. However, this case addresses a business context and legislation which requires interaction between private parties and the state. The effect of this legislation upon the interaction between the private and the public parties must be considered in determining whether state action could be found here.[8] Therefore, plaintiffs cannot prove a conspiracy merely by showing that MDPH officials communicated with CHPC–SEM representatives Carroll and

---

**7.** Thus it is clear that the posture of this case differs from its posture when the court denied a similar motion to dismiss on state action grounds in 1985 in *Huron Valley Hospital v. City of Pontiac,* 612 F.Supp. 654. There, this Court was dealing only with plaintiff's allegations of actions involving both state and private actors, here the court has looked beyond plaintiff's mere allegations after extensive discovery to assess whether a reasonable jury could conclude a conspiracy existed between state and private

actors to deprive plaintiff of its rights under the United States Constitution.

**8.** Admittedly, Michigan courts have held that the law was improperly administered by MDPH when it reviewed plaintiff's application, but the impropriety the state courts have pinpointed is the lack of duly promulgated rules establishing criteria in the CON process. There is a dearth of evidence that the source of any state policy dating back to 1974 was a conspiracy involving defendants and any state representative.

Massaron, and representatives of the four hospital defendants. The fact that MDPH assigned a new, and apparently inexperienced planning analyst to review plaintiff's application, has no bearing on the issue of conspiracy. Further, since MDPH was expected to solicit CHPC–SEM's recommendation, the Court cannot conclude that, merely because MDPH adopted verbatim parts of CHPC–SEM's recommendation, there existed an agreement between the state and private actors to deny plaintiff its CON without due process of law.

In the prior opinion rendered by this Court, the plaintiff conclusorary allegations of conspiracy between state officials and the private defendants were sufficient to defeat a motion to dismiss the Section 1983 count. With far-ranging discovery now complete, the Court finds that a jury could not reasonably find a conspiracy between the private defendants and the state officials to deprive plaintiff of a property interest without due process of law.[9] The Court therefore finds that there is no state action as a matter of law, and defendants' motion for summary judgment on the Section 1983 count as to the hospital defendants, Massaron, and Carroll should be granted.

### VI.

For the reasons given in this opinion, all motions for summary judgment are granted as to both the antitrust count and the 42 U.S.C. § 1983 count. Defendants may present orders and tax costs.

---

9. By this statement, the Court intends to make no comment on the merits of plaintiff's § 1983 claims against the state defendants who are still in this action but not now before the Court.